Melvin K. ROWLETT, Sr.,
Plaintiff, Appellee,

v.

ANHEUSER–BUSCH, INC.,
Defendant, Appellant.

No. 87–1021.

United States Court of Appeals,
First Circuit.

Argued May 26, 1987.

Decided Sept. 30, 1987.

As Amended Nov. 4, 1987.

Alan D. Rose with whom Charles R. Parrott, Jennifer R. Seton and Nutter, McClennen & Fish, Boston, Mass., were on brief, for defendant, appellant.

Martin L. Gross with whom Eleanor H. Holmes, Edward M. Kaplan and Sulloway Hollis & Soden, Concord, N.H., were on brief, for plaintiff, appellee.

Before BREYER and TORRUELLA, Circuit Judges, and RE,* Judge.

TORRUELLA, Circuit Judge.

This is an appeal from a case simultaneously tried to a jury under 42 U.S.C. § 1981 and to a judge under 42 U.S.C. § 2000e et seq. (Title VII). The appeal raises issues relating to the statute of limitations applicable to § 1981 claims, the scope of judicial discretion under Fed.R. Civ.P. 39(b), the quantum of proof necessary to establish intentional racial discrimination, and the damages that are allowable under § 1981. We affirm in part and remand for entry of a new judgment.

*Background*

Melvin Rowlett alleged that Anheuser-Busch, Inc. discriminated against him on

* Chief Judge of the United States Court of International Trade, sitting by designation.

the basis of race in three ways: by denying him training that white coworkers received, by denying him pay raises equivalent to those of white coworkers, and, ultimately, by discharging him. While Rowlett freely conceded that there were no overt acts of racial discrimination, he contended that the facts demonstrated a subtle, but equally damaging, racial bias underlying Anheuser–Busch's actions. The jury found for Rowlett on all three claims. In reviewing the facts presented at trial to support these claims, we, of course, examine them in the light most favorable to plaintiff. *Chedd–Angier Prod. Co. v. Omni Publications Int'l, Ltd.*, 756 F.2d 930, 934 (1st Cir.1985).

In 1970 Anheuser–Busch hired Rowlett as an hourly employee in the quality control lab at its Merrimack, New Hampshire, brewing facility. The quality control lab has a number of work stations where employees test beer as brewed and as packaged to ensure that the product consistently meets Anheuser–Busch's quality standards. Hourly employees generally rotate through these work stations and so become familiar with most or all of the tasks performed in the lab. But Rowlett, who was the only black hourly employee in the lab, did not rotate through the work stations to the extent of his white coworkers. Thus, he was not as familiar with all the tasks of the lab.

In 1975 Rowlett's supervisor, Eduardo Campos, promoted Rowlett to become one of the three shift foremen who supervise the work of the hourly employees in the quality control lab. The Anheuser–Busch job description for the position states that foremen must have "a thorough knowledge of brewing and packaging lab procedures and techniques." Rowlett informed Campos that he had not rotated through all the stations and, thus, did not have a thorough knowledge; he requested training to remedy his deficiencies.

Campos, who had responsibility for training Rowlett, did not do so in 1975. Yet, on Rowlett's 1975 evaluation Campos wrote "further training in planning, analytical techniques and concepts in both quality control and managerial skills is needed to increase his performance." Rowlett requested such further training several times in 1976, 1977, 1978, 1979 and 1980. He did not receive any training from Campos until 1981, after he had enlisted the support of the Anheuser–Busch ombudsman and the equal opportunity employment officer in Anheuser–Busch's St. Louis, Missouri, headquarters.

Notwithstanding Campos' failure to train Rowlett, the annual evaluations Campos prepared for Rowlett consistently mentioned Rowlett's need for training.[1] Anheuser–Busch personnel policy requires an employee's supervisor to remedy a training problem "as immediately as practicable." White employees hired as foremen who had not worked in the quality control lab as hourlies and who therefore, like Rowlett, did not have a "thorough knowledge of brewing and packaging lab procedures and techniques," received formal training in the operations of the various work stations. White employees, both senior and junior to Rowlett, received training in areas in which none of them had worked as hourlies and in which he had requested to be trained in, yet was not trained. When Rowlett finally received the training he requested, in the spring of 1981, the training was for a total of only six hours and was superficial in nature.

Beginning in 1978 Rowlett received smaller pay raises than the other foremen, which Anheuser–Busch attributed to poor evaluations. His evaluations stressed both the need to improve job skills and an absenteeism problem. Rowlett had a relatively high absenteeism rate as compared to other

---

1. The 1976 evaluation stated: "Mr. Rowlett does not have a formal education in the technical and managerial aspects of quality control." The 1977 evaluation stated: "Mr. Rowlett needs to further his technical and managerial aspects of quality control." The 1978 evaluation stated: "Mr. Rowlett should concentrate on dependability and knowledge in overall duties." And the

1979 evaluation stated: (1) "Should concentrate in developing effective technical discipline and workable knowledge in areas of alcohol determination and spectrophotometry"; (2) "Knowledge of work and method of application should develop quality"; and (3) "Individual should concentrate in developing dependability, knowledge of work and planning."

foremen.[2] He attributed his absenteeism to his chronic bronchitis, occasional accidents and job related stress. The stress came, in part at least, from the pressure of having to carry out a job without the necessary training. In 1981 the evaluations resulted in Rowlett being placed on probation for excessive absenteeism.

In March 1981, Rowlett filed a complaint with the New Hampshire Commission of Human Rights alleging that Anheuser–Busch had discriminated against him on the basis of race in training and pay raises and in placing him on probation. Rowlett's fiance (and later wife), Janet Sylvia, had previously filed a claim with the Human Rights Commission, alleging that she had been fired from her hourly position at Anheuser–Busch because of sex discrimination by her foreman, Frank Achee. During a hearing on her case in the fall of 1981, an hourly employee under Rowlett's supervision, Marie Toms, testified that Rowlett had asked to testify on Sylvia's behalf. Ronald Rose, the plant's industrial relations manager, who was present at the hearing on behalf of Anheuser–Busch, was angered to learn, as he put it, that Rowlett had "used [his] position as supervisor to promote an action detrimental to [his] employer, Anheuser–Busch."

After the hearing Rose interviewed Marie Toms and two other hourly employees who had discussed the case with Rowlett. At trial one of the employees testified that Rose denied her request to have a union steward present at the interview and that he began in an intimidating fashion, by asking whether she liked working at Anheuser–Busch and whether it was one of the better jobs in the Merrimack area. After each interview Rose prepared a short affidavit, which extracted from the interview only comments that supported his conclusion that Rowlett had been disloyal, and then directed the employee to sign it. Rose did not contact Rowlett nor attempt to learn his explanation of the events surrounding the Human Rights hearing. On December 4, 1981, without consulting Rowlett's immediate supervisor, Rose terminated Rowlett, for "disloyalty."

Rowlett subsequently filed a second charge with the Human Rights Commission, alleging that he was fired in retaliation for having filed his previous discrimination claim. On February 1, 1983, the Equal Employment Opportunity Commission (EEOC) issued a Right to Sue letter on the training and pay raise claim. Rowlett then filed this suit on May 3, 1983, alleging a violation of Title VII in his training and pay raises. On November 28, 1983, Rowlett received an EEOC Right to Sue letter on the termination claim and subsequently amended his complaint on November 30, 1983, adding a Title VII termination claim and a 42 U.S.C. § 1981 discrimination claim.

The § 1981 claim was tried before a jury, while simultaneously, the Title VII claim was tried before a judge. The jury found Anheuser–Busch liable for discrimination under § 1981 and awarded Rowlett $299,000 in compensatory and $3 million in punitive damages. The district court issued an opinion finding Anheuser–Busch liable under Title VII as well, but awarding no additional damages. Anheuser–Busch appealed.

Anheuser–Busch raises a panoply of issues in this appeal. To begin with the company claims that Rowlett's § 1981 claim is barred by the statute of limitations and that the district court abused its discretion in granting Rowlett a jury trial after he had waived a jury through inaction. On

**2.** Comparative Rates of Absenteeism Among Foremen

| Year | Rowlett | Adams | Thornton | Others |
|---|---|---|---|---|
| 1976 | Rowlett 10% | Adams 2% | Thornton 2% | |
| 1977 | Rowlett 12% | Adams 2% | Thornton 1% | |
| 1978 | Rowlett 19% | Adams 2% | Thornton 1% | |
| 1979 | Rowlett 9% | Adams 1% | Thornton 27% | Paquin 1.5% |
| 1980 | Rowlett 19% | Adams 5% | Thornton 4% | Pitarys 1% |
| 1981 | Rowlett 14% | Adams 2% | Thornton 0.5% | Pitarys 0.5% |
| | Grygalonis 2% | Perdikis 0.5% | Skere 2% | Tamphus 2% |

the merits, Anheuser–Busch argues that the instructions on intentional discrimination were confusing and incorrect, that there was insufficient evidence to support the verdict, and that both the punitive and the compensatory damage awards are excessive.

## I. *Statute of Limitations*

Anheuser–Busch argued below that the appropriate statute of limitations for § 1981 actions in New Hampshire was the six-month period applicable to filing administrative discrimination claims with the New Hampshire Human Rights Commission. N.H.Rev.Stat.Ann. ch. 354–A:9 (1983). Rowlett argued that the appropriate statute of limitations was the six-year period applicable to personal injury claims. N.H.Rev.Stat.Ann. ch. 508:4 (1983). The district court agreed with Anheuser–Busch that the six month period for administrative complaints was applicable, but ruled for Rowlett on the basis that his complaint with the Human Rights Commission tolled the statute of limitations on his § 1981 claim.

Several months after the district court's denial of Anheuser–Busch's motion to dismiss, but before trial, the Supreme Court issued an opinion holding that the appropriate statute of limitations period for § 1983 actions [3] was the state law limitation for personal injury claims, as Rowlett had claimed. *Wilson v. Garcia*, 471 U.S. 261, 278–79, 105 S.Ct. 1938, 1948–49, 85 L.Ed.2d 254 (1985). The Court had held previously that state law statutes of limitations applicable to administrative procedures, like that the district court relied on below, were *not* appropriate for § 1981 claims. *Burnett v. Grattan*, 468 U.S. 42, 104 S.Ct. 2924, 82 L.Ed.2d 36 (1984). Thus, the Supreme Court has clearly spoken in favor of Rowlett's position. The issue before us on appeal is whether *Wilson* and *Burnett* should be given retroactive application.

The Supreme Court recently faced this issue in the case of *Goodman v. Lukens Steel Co.*, —— U.S. ——, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987), which held the *Wilson* rule retroactive in the facts of that case. Since the Court applied the case-by-case equitable approach of *Chevron Oil v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), to decide whether to make an exception to the general rule against retroactive application of court decisions, *see Gulf Offshore Oil Co. v. Mobil Oil Corp.*, 453 U.S. 473, 486 n. 16, 101 S.Ct. 2870, 2879, n. 16, 69 L.Ed.2d 784 (1981), *Goodman* did not decide the precise question before us. We must make our own *Chevron Oil* determination in the facts of this case.

*Chevron Oil* used a three-factor approach for deciding questions of retroactivity: (1) whether the rule sought to be applied retroactively overturns the reasonable expectations of a party; (2) whether retroactive application of the rule fits with the purposes of the rule, and (3) whether the balance of equities favors retroactive application. *See Chevron Oil*, 404 U.S. at 106–107, 92 S.Ct. at 355; *see also Goodman*, —— U.S. at ——, 107 S.Ct. at 2621. With reference to the first factor, *Burnett v. Grattan* overruled clear First Circuit precedent making administrative statutes of limitation applicable to civil rights claims. *See Burnett*, 468 U.S. at 47 n. 9, 104 S.Ct. at 2928. The rule in *Wilson v. Garcia* follows from the *Burnett* ruling; its retroactive application would disappoint Anheuser–Busch's reasonable expectations based on the *Burns v. Sullivan*, 619 F.2d 99 (1st Cir.), *cert. denied*, 449 U.S. 893, 101 S.Ct. 256, 66 L.Ed.2d 121 (1980), line of cases. With reference to the second factor, we agree with the Third Circuit that the purpose behind Wilson was "to promote uniformity and the minimization of unnecessary litigation" and that this purpose does not "militate clearly either in favor of or against retroactive application." *Al-Khazraji v. Saint Francis College*, 784 F.2d 505, 513 (3d Cir.1986), *aff'd.*, —— U.S. ——, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987). Thus our decision, like that of the Third

---

**3.** The statute of limitations for § 1981 and § 1983 claims is the same. *See Goodman v. Lukens Steel Co.*, —— U.S. ——, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987); *Burnett v. Grattan*, 468 U.S. 42, 43, 104 S.Ct. 2924, 2926, 82 L.Ed.2d 36 (1984).

Circuit in *Al–Khazraji,* hinges on equitable considerations: is retroactive application of *Wilson v. Garcia* just?

 Anheuser–Busch is unable to articulate a reason why the retroactive application of *Wilson v. Garcia* would "produce substantial inequitable results." *Chevron Oil,* 404 U.S. at 107, 92 S.Ct. at 355. The company argues that retroactive application would be unfair to other plaintiffs who settled or abandoned their claim based on the previous rule; but that is the case with any change in the law. Anheuser–Busch can claim no injustice to itself because the added burden of defending a § 1981 claim on top of the Title VII claim is minimal. That Anheuser–Busch's conduct might have been sufficiently wrong to justify punitive damages (which are not available under Title VII) is hardly a persuasive reason in equity to eliminate the § 1981 claim. The best the company can do is to reverse the rule/exception format of the retroactivity/non-retroactivity debate and assert that non-retroactivity is not unfair to a plaintiff who should have known that circuit precedent cut off his rights before he asserted them. But that is not the issue before us. Had this case, rather than *Burnett* or *Wilson,* been the vehicle to attack administrative statutes of limitation in favor of personal injury statutes of limitation, Rowlett surely would have benefitted from the decision. That some other plaintiffs carried the laboring oar before him should not change that result. *Wilson v. Garcia* applies to this case.

## II. *The Jury Trial*

Federal Rule Civil Procedure 38(b) provides that:

> Any party may demand a trial by jury of any issue triable of right by a jury by serving upon the other parties a demand therefor in writing at any time after the commencement of the action and not later than 10 days after the service of the last pleading directed to such issue.

When Rowlett filed his original pro se complaint in May 1983 he did not request a trial by jury within the requirements of Rule 38(b). Thus, under that rule, he waived his right to trial by jury. On January 11, 1985, however, he filed a motion for a jury trial under Fed.R.Civ.P. 39(b), which states:

> Issues not demanded for trial by jury as provided in Rule 38 shall be tried by the court; but, notwithstanding the failure of a party to demand a jury in an action in which such a demand might have been made of right, *the court in its discretion upon motion may order a trial by a jury* of any or all issues.

(Emphasis added). Rowlett's counsel explained that they had been under the mistaken impression that Rowlett had requested a jury trial when he was proceeding pro se. The district court granted the motion. The question on appeal is whether the district court abused its discretion in so doing.

Rule 39(b) itself contains no reference to any limitations on the district court's discretion to grant or deny the Rule 39(b) motions. Nor have we had any opportunity to rule on the limits of that discretion. *See In re Previn,* 204 F.2d 417 (1st Cir. 1953) (declining to reach the issue); *cf. Omawale v. WBZ,* 610 F.2d 20 (1st Cir. 1979) (ruling on the basis of Rule 38(b) where no Rule 39(b) motion had been made). Our review of how other courts have defined boundaries of Rule 39(b) discretion reveals two different approaches.

The first approach, typified by Judge Friendly in *Noonan v. Cunard Steamship Co.,* 375 F.2d 69, 70 (2nd Cir.1967), narrows that discretion by requiring that the moving party show something *"beyond* mere inadvertence." *Accord Lewis v. Time, Inc.,* 710 F.2d 549, 556–57 (9th Cir.1983) (a trial court's discretion under Rule 39(b) "is narrow ... and does not permit a court to grant relief when the failure to make a timely demand results from an oversight or inadvertence"). The second approach, espoused most clearly by the Fifth Circuit, narrows the discretion in the *other* direction: "when the discretion of the court is invoked ..., the Court should grant a jury trial in the absence of strong and compelling reasons to the contrary." *Swofford v. B & W, Inc.,* 336 F.2d 406, 409 (5th Cir.1964), *cert. denied,* 379 U.S. 962, 85 S.Ct. 653, 13 L.Ed.2d 557 (1965); *accord*

*AMF Tuboscope, Inc. v. Cunningham*, 352 F.2d 150, 155 (10th Cir.1965) (reversing a denial of a Rule 39(b) motion).

We are of the view that the discretion under Rule 39(b) is very broad and that the case would be very rare indeed where a district court abused its discretion in denying *or* granting a Rule 39(b) motion. *See* 9 Wright and Miller, *Federal Practice and Procedure* § 2334 at 115, 123. It is certainly not an abuse of discretion for a district court to grant a Rule 39(b) motion to a pro se plaintiff on the basis of mere inadvertence. Anheuser–Busch argues, however, that once Rowlett obtained counsel, counsel should be held responsible for *immediately* determining whether a jury had been requested, or at the very latest by the time the amended complaint was filed in November 1983. Beyond that date, the company argues, a court may not grant the Rule 39(b) motion simply because counsel had been under the mistaken impression that Rowlett had requested a jury trial when proceeding pro se.

■ Although we certainly agree that conscientious counsel should have checked to make sure Rowlett had requested a jury in what was so obviously a jury case, we are not prepared to say that the district court abused its discretion by refusing to penalize Rowlett for that lapse of counsel. Anheuser–Busch was not prejudiced by the granting of the Rule 39(b) motion; the trial was not delayed or extended, nor was there any unfair surprise. *See Pawlak v. Metropolitan Life Ins. Co.*, 87 F.R.D. 717, 719 (D.Mass.1980). Anheuser–Busch cannot seriously have expected that Rowlett preferred a bench trial on the § 1981 claims. Furthermore, Rowlett's initial status as a pro se plaintiff justifies the district court's decision to grant him some indulgence on the waiver of a jury trial. *See Merrit v. Faulkner*, 697 F.2d 761, 766 (7th Cir.), *cert. denied*, 464 U.S. 986, 104 S.Ct. 434, 78 L.Ed.2d 366 (1983).

## III. *Jury Instructions on Intentional Discrimination*

In instructing the jury on intentional discrimination, the district court used the *McDonnell–Douglas* framework, which we held applicable to jury trials in *Loeb v. Textron*, 600 F.2d 1003, (1st Cir.1979). *See McDonnell–Douglas Corp. v. Greene*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see also Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The *McDonnell–Douglas* framework permits a plaintiff to prove intentional discrimination by introducing sufficient evidence to create a presumption of discrimination; in many cases the fact that the member of the protected class was treated differently from other similarly placed employees is enough. *See McDonnell–Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. The defendant then has a burden of *production* to rebut that inference by articulating a nondiscriminatory reason for its actions. *Id.* If the defendant cannot give a nondiscriminatory reason, the plaintiff prevails on the basis of the prima facie case. But if the defendant does articulate a nondiscriminatory reason, the plaintiff may prove intentional discrimination by demonstrating that the reason was a pretext, hiding the real discriminatory motive. *Id.*, 411 U.S. at 804, 93 S.Ct. at 1825.

Although this framework was considered complicated and cumbersome when it was first used in *McDonnell–Douglas*, with repeated use courts have become more comfortable with it, both for their own use in ruling on Title VII claims and for the jury's use in ruling on intentional discrimination. *See Loeb v. Textron, supra.* It is a straightforward way of explaining how to consider whether there is intentional discrimination in situations where such discrimination is not likely to be overt.

■ Thus, the district court was correct in using the framework in the instructions to the jury. The framework was well adapted to the proof presented and was, apparently, perfectly acceptable to defendant's trial counsel (who has been replaced for this appeal). The instructions did not, as Anheuser–Busch argues for the first time on appeal, shift the burden of proof to the defendant. The district court was careful to say that "the defendant need only

articulate or explain legitimate, nondiscriminatory reasons sufficient to raise a genuine factual issue as to whether it did discriminate against Mr. Rowlett." Furthermore, the jury's question to the court during deliberations demonstrates that the jury understood that plaintiff retained the burden of proof throughout. The jury asked:

> Point of law. Your charge to the jury was, first, the plaintiff must establish that he was treated differently; second, the defendant gives reasons for those differences; third, the plaintiff must then show evidence that those reasons were pretexts. Question: If these three points have been established on a complaint has "purposeful racial discrimination" then been established in that complaint?

Anheuser–Busch argues, also for the first time on appeal,[4] that the district court should have instructed the jury that they could not find for Rowlett unless racial discrimination was a "but for" cause of the harm he suffered. *See Loeb v. Textron,* 600 F.2d at 1019. The company's position below, which the district court properly rejected, was that racial discrimination must be the *only* reason for the harm. The district court instructed the jury that racial discrimination must be the "actual motive" or "one of the actual reasons" or a "decisive reason" for the complained of action and that Rowlett must prove he was denied training, etc., "because of racial discrimination." These formulations do not track the "but for" language of *Loeb v. Textron* but they go just as far in instructing the jury that discrimination must be a "determining factor." *Id.,* 600 F.2d at 1019.

## IV. *Sufficiency of the Evidence*

In reviewing the record to determine whether there was sufficient evidence to support the court's and the jury's findings under Title VII and § 1981, we will use the same *McDonnell–Douglas* framework used below. For each of Rowlett's claims evidence sufficient to support a jury finding of intentional discrimination under § 1981 is also sufficient to support the court's finding under Title VII. *See Hudson v. Int'l Business Machines,* 620 F.2d 351, 354 (2d Cir.), *cert. denied,* 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 611 (1980). Accordingly, we will not distinguish among the two in discussing the evidence.

## A. *Discrimination in Training*

Rowlett introduced evidence that showed that his supervisor knew he needed training, that he repeatedly requested training, that white foremen who needed training were trained, and that he was not trained, until he went over the local management's head to Anheuser–Busch headquarters. Anheuser–Busch argues on appeal that this evidence did not establish a prima facie case of disparate treatment, because none of the employees promoted to foreman from the rank of the hourlies received formal training; only those hired "off the street" with no prior experience in beer quality control received formal training. We agree with the district court, however, that the relevant group for comparison is "white foremen who needed training," and not "white foremen promoted from hourlies." As an hourly Rowlett had not received as much on the job training as white workers; thus, like foremen hired from outside, Rowlett needed training to fulfill his duties as described in his job description.

At trial Anheuser–Busch explained the disparate treatment as resulting from Rowlett's absenteeism; Campos said he could not train Rowlett because Rowlett was absent from work so often. To show this reason was pretextual, Rowlett presented evidence that the training he finally received in 1981 took only six hours. Although that training was superficial, its short duration does indicate that Rowlett's absences did not really prevent him from

---

**4.** Our mention of this and other issues which were raised for the first time on appeal is not meant to undercut our rather firm rule against consideration of issues not raised below, *see* *Johnston v. Holiday Inns, Inc.,* 595 F.2d 890 (1st Cir.1979). We deal with them only to demonstrate that the trial was not the profoundly flawed proceeding that Anheuser–Busch claims.

being trained. His evaluations consistently mentioned the need for training; defendant's own personnel policy required him to be trained as soon as practicable; white employees who needed the training received it; and the only justification Anheuser–Busch provided could reasonably be seen as pretextual. This evidence is sufficient to support the finding of intentional racial discrimination.

### B. Discrimination in Pay Raises

■ The district court found that Anheuser–Busch had discriminated against Rowlett on the basis of race in the pay raises he received. He established a prima facie case by showing that he received smaller raises than the white foremen received. Anhesuer–Busch explained this disparate treatment as resulting from Rowlett's evaluations. The district court found this reason to be pretextual, however, because it was so intricately related to the denial of training. Rowlett had been criticized for his lack of skills, for his lack of initiative, and for his absenteeism. Yet the court found that the lack of skills were directly related to the discriminatorily denied training, that the lack of initiative could well have resulted from not knowing what to do, and that the absenteeism was due in part to job-related stress resulting from not being trained. We find this reasoning persuasive. *See also Washington v. Kroger*, 506 F.Supp. 1158, 1169–70 (W.D.Mo.1981), *vacated on other grounds*, 671 F.2d 1072, 1076 (8th Cir.1982) (agreeing with district court that absenteeism and tardiness were related to a lack of training). There was sufficient evidence to support a finding of intentional discrimination on the basis of race in the pay raises given to Rowlett.

### C. Discrimination in Discharge

Rowlett established a prima facie case of racial discrimination in his discharge by showing his history of discriminatory treatment at Anheuser–Busch, by showing that he had filed a race discrimination claim against Anheuser–Busch (of which Ronald Rose was aware), and by showing that he was discharged not long after filing that claim. *See Hochstadt v. Worcester Foun-*

*dation,* 425 F.Supp. 318, 324–25 (D.Mass.), *aff'd,* 545 F.2d 222 (1st Cir.1976); *see also Gifford v. Atchison, Topeka and Santa Fe Ry. Co.,* 685 F.2d 1149, 1155 (9th Cir.1982); *Goff v. Continental Oil Co.,* 678 F.2d 593, 598 (5th Cir.1982). Given Anheuser–Busch's admission that Rowlett's work had been satisfactory, the likelihood of a discharge being retaliatory in these circumstances is so great that the *McDonnell–Douglas* rebuttable presumption is especially apt.

Anheuser–Busch explained the discharge as following from Rowlett's disloyalty in using his position as foreman to promote his wife's sex discrimination claim, when he had not apprised management of the problems in the workplace that led to the claim. Ronald Rose, who fired Rowlett, specifically stated that he did not rely on Rowlett's evaluations or absenteeism in deciding to terminate him. Rather, Rose relied on what he learned from interviewing hourly workers and attending the Human Rights Commission hearing.

■ To show the loyalty explanation was pretextual, Rowlett presented evidence that Rose's investigation was one-sided and designed to confirm his desire to dismiss Rowlett. There was some evidence that one of the disloyal comments Rowlett allegedly made, and which Rose testified he relied on in discharging him, was not actually known by Rose at the time Rowlett was discharged. The evidence supports an inference that Rose was out to get Rowlett and that Rose attempted to protect himself from the consequences by building a case, both before and after the fact. Rose knew that Rowlett had complained to St. Louis about discriminatory treatment and that Rowlett had filed a suit in the Human Rights Commission. This evidence supports an inference that the reason Rose was out to get Rowlett was racial discrimination. The evidence is not overwhelming; the case is not clear cut; but the inference is permissible. *Cf. United States v. Rivera Rodriguez,* 808 F.2d 886, 888 (1st Cir.1986) (under more demanding criminal standard of proof, jury is entitled to freely choose

among reasonable inferences). The judge and the jury watched the witnesses on the stand and observed the parties throughout the trial. We will not disturb their decision that Rowlett's superiors engaged in purposeful racial discrimination.

## V. *Jury Instructions on Retaliatory Discharge*

In instructing the jury on Rowlett's discharge claim the district court stated:

> As regards the claims of retaliatory discharge, you will recall that the evidence before you is to the effect that Mr. Rowlett had filed his own discriminatory claim with respect to the training issue before the New Hampshire Human Rights Commission, and his wife, Janet Silvia Rowlett, had filed a claim of sexual harassment against the defendant before the same commission. These claims were filed pursuant to Title Seven of the Federal Statute, set forth in Title 42 United States Code Section 2,000, et. seq., a statute itself which is not before you with respect to any issues you are to decide, but which statute permits people in the positions of Mr. Rowlett and his wife to file claims of discrimination in their employment. Under the Federal–State cooperative venture that administers such laws, the New Hampshire Human Rights Commission is the place where hearings are held with respect to such claims of discrimination, whether grounded on race, sex or other conditions of employment. With regard to the dual claims of discrimination therefore, with respect to any one of such claims, the elements are, first, that Mr. Rowlett's actions in participating in these proceedings before the Human Rights Commission were protected by law; second, that the actions taken against him by the defendant were in retaliation for such participation. If Mr. Rowlett establishes that he participated in a protected proceeding, and the fact that subsequent adverse action was taken against him by his employer, he has established a presumption or prima facie case of retaliatory discharge. It then becomes the obligation of the defendant, Anheuser–Busch, to articulate or explain that its reasons for its discharge of Mr. Rowlett were legitimate and non-discriminatory. If it furnishes such reasonable explanation of its actions, then the burden again shifts to Mr. Rowlett *to prove by a preponderance of the evidence that the reasons presented by the defendant for his discharge were a mere pretext for the actual motive of discharge, that is, that his race was a decisive reason the company discharged him from its employment.* Such racial discrimination need not be the only reason for discharge, so long as a preponderance of the evidence demonstrates it to be a probable reason. Generally speaking, as I have just indicated to you, an employee may not only exercise his or her own rights to advance a discrimination claim pursuant to Title Seven, so-called, but may also assist another. But when, however, the employee seeks to assist other employees, if such assistance goes beyond mere advice, the issue for the jury to determine is whether, on the balance of the evidence, the actions taken with regard to such assistance so disrupts the internal discipline or the stable work environment of the employer that disciplinary action is warranted as against the employee. *You are not here to second guess the business judgments of the defendant, but to determine if its actions were motivated by racial discrimination.*

(Emphasis supplied). The court repeated this instruction in full in response to a question from the jury "to explain the legal rights relative to participation in the human rights commission suit...."

Anheuser–Busch raises a host of objections to this instruction, some preserved at trial and some not. Most relate to Anheuser–Busch's contention that the instruction confused the jury by mixing up the two Human Rights Commission actions—Rowlett's and his wife's—and thereby shifted the jury's attention from intentional race discrimination. Anheuser–Busch argues that this confusing instruction, combined with the overly technical *McDonnell–*

*Douglas* explanation of intentional discrimination, could well have encouraged the jury to abandon its collective common sense and, through a counter-intuitive analysis, to arrive at the conclusion that Rowlett's discharge was the result of intentional race discrimination, even though none of the members of the jury thought that Rowlett's being black had anything to do with the discharge.

■ There is some merit to Anheuser–Busch's position. The instruction is somewhat confusing, particularly the part referring to "dual claims of discrimination." Anheuser–Busch is perfectly correct in asserting that § 1981 does not provide a cause of action for discharge in retaliation for assisting a sex discrimination suit. *See Great American Federal Savings & Loan Ass'n v. Novotny*, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979). The jury's question regarding "rights relative to participation in the human rights commission suit" suggest that they may, in fact, have been confused on this point. The section of the instruction giving the *Hochstadt* balance between an employee's right to promote discrimination claims and the employer's interest in a stable work environment, *see Hochstadt v. Worcester Foundation*, 545 F.2d 222, 231 (1st Cir.1976), may also have unnecessarily focused the jury's attention on the sex discrimination claim. The better practice would have been to leave discussion of the sex discrimination claim out of the discharge instruction altogether. This was by no means a perfect, or even a good, jury instruction. Nevertheless, the instruction taken as a whole correctly focused on intentional race discrimination. We find it very important that the special verdict form, which the jury carried into its deliberations, asked "Do you find that such retaliatory discharge of Mr. Rowlett was the result of purposeful racial discrimination on the part of defendant?" The entire focus of the trial was whether Anheuser–Busch did what it did to Rowlett because he was black. We do not think that the instruction, confusing as it may have been, changed that focus, particularly in light of this very clear question on the special verdict form. *See Pimental v.*

*Pina*, 815 F.2d 173 (1st Cir.1987) (finding that the jury's unequivocal answer in a special verdict form rendered an error in an instruction harmless). Furthermore, the large punitive damages award suggests that members of the jury understood, and were affected by, the case in a way that made sense to them, and not in the counter-intuitive way Anheuser–Busch suggests. The instruction is not grounds for reversal.

## VI. *Damages*

### A. *Compensatory Damages*

The jury awarded Rowlett $299,000 compensatory damages. Rowlett had presented proof at trial of lost wages totalling, according to his counsel, $176,000. Joint Appendix at 1277–78. Anheuser–Busch challenges only the remainder of the compensatory damages, which were granted for the emotional distress associated with the intentional discrimination proved at trial.

■ At trial Rowlett testified that he had been "continuously" under stress while working at Anheuser–Busch, because he was afraid he would make a mistake due to his lack of training, and that after the discharge he was unemployed, suffering the attendant financial and emotional problems. Rowlett presented a videotaped deposition of an expert witness, a psychiatrist he had seen while at Anheuser–Busch and for a short time afterwards (until he could no longer afford to). The psychiatrist stated that Rowlett was "suffering from symptoms of anxiety, stress and some depression," Supplemental Appendix at 2819, for which he was treated with an antidepressant. Rowlett's testimony, in combination with that of the psychiatrist and with the jury's common sense judgment of the emotional complications that would accompany the intentional discrimination Rowlett suffered, provides an adequate basis for the portion of the compensatory damage award attributable to emotional distress. *See Hall v. Ochs*, 817 F.2d 920, 927 (1st Cir. 1987); *cf. Pérez v. Rodriguez Bou*, 575 F.2d 21, 25 (1st Cir.1978) (reversing compensatory damages for emotional distress

where there was "no evidence of loss of employment ... or medically cognizable psychological distress"). One-hundred twenty-three thousand dollars is not "grossly excessive" compensation for the emotional distress that would accompany several years of discrimination at work and a significant period of unemployment. *See Brown v. Freedman Bakery,* 810 F.2d 6, 11 (1st Cir.1987). The compensatory damages award is affirmed.

### B. Punitive Damages

In addition to the compensatory damages award, the jury also awarded Rowlett $3 million in punitive damages. Anheuser–Busch attacks this award in several ways. The company argues that the court gave the jury the wrong legal standard to use in determining whether to award punitive damages, that the evidence is insufficient to support an award of punitive damages, that the court erred in admitting evidence of the financial condition of the parent company, and that the amount of the award is excessive.

The Supreme Court recently addressed the standard for punitive damages in civil rights actions in the case of *Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). After an extensive discussion of Congressional intent and the policies behind punitive damage awards, the court concluded:

> We hold that a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.

*Id.* at 56, 103 S.Ct. at 1640. In reaching this decision the Court ruled that Congress intended that damage awards in civil rights actions be governed by the same principles as damage awards under the common law. The standard that the Court adopted tracks almost exactly the approach of the Restate-

ment (Second) of Torts § 908, as the Court itself recognized. *See id.* at 46–47, 103 S.Ct. at 1635–36. Section 908(2) provides:

> Punitive damages may be awarded for conduct that is outrageous, *because of defendant's evil motive or his reckless indifference to the rights of others.*

(Emphasis supplied).

As some courts have recognized, this standard means that, in jurisdictions where punitive damages are authorized, punitive damages are within the jury's discretion in cases requiring proof of intentional wrongdoing. *See Smith v. Wade,* 461 U.S. at 53–54, 103 S.Ct. at 1638–39, and cases cited therein. In such cases, the state of mind necessary to trigger liability for the wrong is at least as culpable as that required to make punitive damages applicable. That does not mean that punitive damages are appropriate in every case of an intentional wrong, but rather that in each case the trier of fact has the discretion to determine whether punitive damages are necessary, "to punish [the defendant] for his outrageous conduct and to deter him and others like him from similar conduct in the future." *Id.* (quoting Restatement (Second) of Torts § 908(1) (1979)).

Anheuser–Busch argues that something more than intentional discrimination is necessary, citing our opinion in *Alicea Rosado v. Garcia Santiago,* 562 F.2d 114, 121 (1st Cir.1977), where we said "intentional interference with constitutional rights, standing alone, is not enough [to permit punitive damages]; there must be aggravating circumstances." The district court below instructed the jury on punitive damages by essentially paraphrasing the *Smith v. Wade* holding, without any mention of a requirement of aggravating circumstances.[5] Anheuser–Busch claims this lapse is reversible error. The company argues that *Smith v. Wade* only establishes the requisite level of intent and does not disturb the additional *Alicea Rosado* requirement.

---

**5.** The district court instructed the jury as follows:

> Where a plaintiff in a racial discrimination case establishes the elements of malice, or callous and reckless indifference by a pre-

pondrance of the evidence, then a jury is allowed in its discretion to assess punitive damages against the discriminatory defendant for the purpose of punishment of such defendant, and as a deterrent to others.

A close reading of *Smith v. Wade,* however, along with § 908 of the Restatement (Second) of Torts, which the Court relied on heavily to explain its reasoning, convinces us that defendant's position, although certainly appealing,[6] would improperly restrain the trier of fact. *Smith v. Wade* precludes us from giving the effect Anheuser–Busch would like to the language in *Alicea–Rosado.*[7] In *Smith v. Wade* the Court discusses the finding of recklessness, i.e., the requisite level of *intent,* as a "threshold," beyond which the jury may in its "discretionary moral judgment," award punitive damages. 461 U.S. at 52, 103 S.Ct. at 1638.

Anhesuer–Busch is correct in pointing out that the instruction affirmed in *Smith v. Wade* stated that punitive damages are permitted "to punish the wrongdoer for some extraordinary misconduct," but the Court never once referred to that language, only to the language regarding the level of intent. The Court made no mention of any requirement that, in addition to charging the jury about the level of intent necessary to support punitive damages, a trial court also explain to the jury that the misconduct be "extraordinary" or "outrageous." We will not construe this silence as a mere inadvertent lapse. *See Rodgers v. Fisher Body Div., G.M.C.,* 739 F.2d 1102, 1109 (6th Cir.1984), *cert. denied,* 470 U.S. 1054, 105 S.Ct. 1759, 84 L.Ed.2d 821 (1985). As *Smith v. Wade* and § 908 of the Restatement (Second) of Torts make clear, misconduct is "extraordinary" (in the language of the *Smith v. Wade* instruction) or "outrageous" (in the language of the Restatement) *because of the intent of the wrongdoer. See also Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 233, 90 S.Ct. 1598, 1642, 26 L.Ed.2d 142 (1970) (Brennan, J., concurring in part and dissenting in part). Comment b to § 908 states that conduct is outrageous "either because the defendant's acts are done with an evil motive or because they are done with reckless indifference to the rights of others." Rest. (2d) Torts § 908 comment b (1979).

■ Accordingly, the instruction below was proper. The part of the instruction explaining the intent necessary to award punitive damages was, for the reasons stated above, unnecessary, but it was certainly not prejudicial to defendants. *See* note 4. Most importantly, the instruction explained to the jury that punitive damages may be awarded "for the purpose of punishment ... and as a deterrent to others." Although a court certainly may tell a jury that "punitive damages are awarded to punish outrageous conduct," the failure to use that, or equivalent, language is not error. In a case involving intentional race discrimination the explanation of the twin purposes of punishment and deterrence is sufficient to guide the jury. After all, can it really be disputed that intentionally discriminating against a black man on the basis of his skin color is worthy of some outrage?

■ We strongly question, however, whether Anheuser–Busch's conduct warranted $3 million worth of outrage. Although juries have wide discretion in deciding the amount of punitive damages, courts have the power to reduce awards that are "'grossly excessive' or 'shocking to the conscience'." *Fishman v. Clancy,* 763 F.2d 485, 489 (1st Cir.1985) (quoting *LaForest v. Autoridad de las Fuentes Fluviales de P.R.,* 536 F.2d 443, 444 (1st Cir. 1976)). The $3 million award in this case is grossly excessive. The evidence of discrimination, although sufficient, was hardly overwhelming. The large compensatory damage award, by itself, provides significant deterrence, even to employers as large as Anheuser–Busch.[8] Three million dollars

**6.** For a trenchant statement of the problems with punitive damages and some reasons for restraining their application, *see* Chief Justice Rehnquist's dissent in *Smith v. Wade,* 461 U.S. at 56, 103 S.Ct. at 1640.

**7.** We note that the case we cited in *Alicea Rosado* in support of the aggravating circumstances requirement, *Silver v. Cormier,* 529 F.2d 161, 163 (10th Cir.1976), like the Restatement, treats the level of intent as itself an aggravating circumstance.

**8.** We assume that losing a § 1981 suit, by itself, will provide enough direction to Anheuser–Busch to make sure that in the future its industrial relations managers are given more orienta-

more is not necessary to punish Anheuser–Busch and to deter other employers. We cannot sanction the jury's apparent attempt to grant a windfall to a sympathetic plaintiff. *See Lenard v. Argente*, 699 F.2d 874, 890 (7th Cir.1983), *cert. denied*, 464 U.S. 815, 104 S.Ct. 69, 78 L.Ed.2d 84 (1984).

The issue of the appropriate level of punitive damages is a difficult one for courts confronted with an award that is grossly excessive. As the Eighth Circuit has observed, "[i]n reviewing an award of punitive damage there is no basis from which an appellate court may measure damage." *Guzmán v. Western State Bank of Devils Lake*, 540 F.2d 948, 954 (8th Cir.1976). Furthermore, remanding a case under such circumstances serves no useful purpose. The case would have to be retried totally just to determine punitive damages, all of which would place an intolerable burden on the parties and the court. Even still the jury would be faced with an elusive goal. Since we have determined that punitive damages are appropriate in this case, it is best that we come to grips with the problem of the amount of damages to be awarded, without remand, on the basis of the record available and the guidance afforded by other cases.

The case law does provide some guidelines. It has been held that to punish a defendant the award must be enough to "smart." *See Brink's, Inc. v. City of New York*, 546 F.Supp. 403, 413 (S.D.N.Y.1982), *aff'd*, 717 F.2d 700 (2d Cir.1983). Thus, a rich defendant may well be required to pay more than a poor one who committed the same wrong.[9] *See Bell v. City of Milwaukee*, 746 F.2d 1205, 1267 (7th Cir.1984); Rest.2d (Torts) § 908(2) (1979). And, because the award is punishment, it must bear some relation to the "character of the defendant's act" along with "the nature and extent of the harm to the plaintiff that the defendant caused." Rest.2d (Torts) § 908(2). Given the close nature of this

case, the apparent isolation of the discrimination proved, and the generous compensatory damages, this factor counsels some restraint in the amount of the award. On the other hand, the award should be sufficient to deter others from such conduct in the future. *Id.* Furthermore, considering that Anheuser–Busch is a substantial company, any amount adjudged must be sufficient to deter it or any other rational employer from repeating such conduct in the future. Recognizing that this exercise is less than scientifically accurate, we conclude on the basis of the record that $300,000 is sufficient for these purposes.

■ Because we believe that trial courts, after hearing the evidence in a case, are in an inherently better position than appellate courts to judge the reasonableness of an award for punitive damages, it should be the district courts which initially pass upon this matter. In future cases, once the district court determines that awarding punitive damages is within the jury's discretion, the court should instruct the jurors that, if they conclude that such damages are to be granted, in determining the amount to be granted, they should engage in a balancing test taking into consideration such factors as the grievousness of the conduct, the solvency of the guilty party, and the potential for deterrence of the verdict.

The decision of the district court is *affirmed with the exception of the award of punitive damages. That portion of the jury verdict relating to punitive damages is set aside; the judgment is vacated and the case is remanded for further proceedings consistent with this opinion.*

tion in the requirements of equal employment law than Ronald Rose testified he received.

**9.** Anheuser–Busch's complaint about the introduction of evidence regarding the wealth of its parent corporation is not well taken. Rowlett had asked for financial information regarding

Anheuser–Busch, Inc., and the company had not provided anything other than the annual report of the parent corporation. They cannot now complain that Rowlett used that information to evaluate Anheuser–Busch's wealth.