# United States Court of Appeals
## For the First Circuit

No. 14-1500

T G PLASTICS TRADING CO., INC.,
d/b/a NATIONAL PLASTICS TRADING CO.,

Plaintiff, Appellee,

v.

TORAY PLASTICS (AMERICA), INC.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. John J. McConnell, Jr., U.S. District Judge]

Before

Lynch, Chief Judge,
Howard, Circuit Judge,
and Saylor,[*] District Judge.

Sanford I. Weisburst, with whom Ryan S. Goldstein, Daniel H. Bromberg, Quinn Emanuel Urquhart & Sullivan, LLP, Jeffrey S. Brenner, and Nixon Peabody LLP were on brief, for appellant.

James Ratzel, with whom Michael J. Daly, Pierce Atwood LLP, and Ratzel, Pytlik & Pezze, LLC were on brief, for appellee.

December 22, 2014

---

[*] Of the District of Massachusetts, sitting by designation.

**LYNCH, <u>Chief Judge</u>**.  In 2007, Toray Plastics (America), Inc. ("Toray") of Rhode Island, a manufacturer of plastic film products, and T G Plastics Trading Co., Inc. ("National Plastics"), a Colorado-based broker of plastic film products, entered into a Settlement Agreement to resolve a pending lawsuit.  As part of the Settlement Agreement, Toray agreed to sell certain materials exclusively through National Plastics and to pay National Plastics a twelve percent commission on all sales of the materials thereby generated.  National Plastics, believing that Toray had not held up its end of the bargain, sued Toray for breach of the Settlement Agreement.  A jury found Toray liable and awarded National Plastics over $2 million in damages.  Toray appeals, arguing that National Plastics had waived its right to a jury trial by a belated demand, and that the evidence was insufficient as a matter of law to support the jury's finding of liability or its calculation of damages.  We affirm, sounding a cautionary note as to delayed demands for jury trials.

I.

Toray is a manufacturer of plastic films which are used in various food packaging and industrial applications.  Toray's manufacturing processes produce excess materials, such as scrap left over after rolls of film are cut to a customer's specifications, and film that is damaged or otherwise rendered unusable during the manufacturing process.  Toray has historically

-2-

sold this material to plastics brokers.  The brokers then resell the materials, often to businesses abroad or to customers in "secondary" or "commodities" markets, such as the floral industry.

National Plastics is a plastics broker that has purchased excess materials from Toray since 1988.  In the mid-2000s, National Plastics allegedly fell behind on payments owed to Toray, and in May 2006, Toray filed a lawsuit to recover approximately $1.5 million in outstanding payments ("the First Lawsuit").  National Plastics counterclaimed, alleging, among other things, that Toray had committed breach of contract and tortious interference with a business relationship.

After conducting "months of discovery," the parties eventually settled the First Lawsuit.  The terms of the settlement were memorialized in a "Settlement Agreement and Release," signed on October 15-16, 2007, which provided that, "[i]n full and final settlement of the [First Lawsuit] . . . Toray and National Plastics will enter into a long term business relationship . . . and National Plastics will pay Toray $1.5 million."  As part of that "long term business relationship," Toray agreed that, for a period of seventeen years beginning on October 22, 2007, it would

> exclusively sell to National Plastics one hundred percent (100%) of all scrap plastic, other scrap, second quality materials, downgraded materials, recyclable materials not reused internally and aged film.  Because Toray does not have direct control over the end use or applications of these items . . ., Toray cannot guarantee performance of this

film in any application.  During the Term, Toray will also regularly share all information with National Plastics on all persons or entities approaching Toray for purchase of Toray's scrap plastic, other scrap, second quality materials, downgraded materials, recyclable materials and aged film. National Plastics will be responsible for contacting all of these possible leads and following up with Toray on the outcome.

The Settlement Agreement further provided that, "[i]n order to insure that Toray is receiving competitive market pricing, National Plastics will work on a straight twelve percent (12%) of all sales generated by National Plastics."  It also contained a provision giving each party the right to audit the other on an annual basis in order to ensure compliance.

The parties refer to the list of items Toray agreed to sell exclusively to National Plastics -- "scrap plastic, other scrap, second quality materials, downgraded materials, recyclable materials not reused internally and aged film" -- as the "agreed materials."  The principals who negotiated the Settlement Agreement, Toray Chief Financial Officer David Jose and National Plastics owner Torge Goderstad, did not discuss the precise meaning of the words describing the agreed materials.  In particular, the term "aged film" was added to the Settlement Agreement near the end of settlement negotiations and is not defined elsewhere in the agreement.

Soon after executing the Settlement Agreement, the parties began to dispute several aspects of its application,

including, as relevant here, Toray's duty to sell aged film exclusively to National Plastics. In July 2009, National Plastics sued Toray in federal court in Rhode Island, claiming damages stemming from Toray's alleged failure to sell 100 percent of the agreed materials to National Plastics and requesting specific performance of the Settlement Agreement's auditing provisions. The original complaint did not contain a jury demand.

After two years of settlement negotiations, which ultimately proved fruitless, National Plastics moved to amend its complaint in June 2011 to add three additional claims and a request for a jury trial. The district court granted the motion for leave to amend over Toray's objection. Toray counterclaimed, alleging breach of the Settlement Agreement. However, by the time the case was submitted to the jury in January 2014 -- roughly thirty months after National Plastics filed its amended complaint -- the dispute had, for all practical purposes, been narrowed to a single issue: whether Toray had breached its duty under the Settlement Agreement to sell aged film exclusively to National Plastics.[1] National Plastics' claim of damages was based solely on this alleged "aged film" breach; it did not request damages based on Toray's sales of any of the other "agreed materials."

---

[1] The parties' other claims had either been withdrawn or dismissed.

At trial, a primary issue in contention was whether there had been any meeting of the minds as to the meaning of the term "aged film." There was conflicting evidence presented regarding that issue. Toray CEO Richard Schloesser and CFO Jose testified that, "[f]rom an accounting standpoint," material is considered "aged" one year after its manufacture, at which point Toray takes a reserve against the material for financial accounting purposes. Schloesser admitted that, in a deposition in the First Lawsuit (in which the meaning of the term "aged material" was at issue) he had defined "aged material" as "film generally that reaches one year" and is "written down by the Finance Department." This description is also consistent with e-mails Schloesser sent to Goderstad after execution of the Settlement Agreement, in which Schloesser wrote that "each month a report is generated that targets film that is 11 months old and will go aged in the next month." Toray's policy is in accordance with Generally Accepted Accounting Principles, under which companies are required to value their assets in a manner "grounded in reality" in order to prepare accurate financial statements. According to National Plastics' expert accountant, Catherine Parente, Toray's inventory reserve policy "indicat[ed] . . . that the age of the inventory significantly affects the value of that inventory . . . . [b]y reducing it." Schloesser also testified, however, that "from an operational stand point, [plastic film] does not age; it's inert. . . . [Toray]

could sell that film that we produced today three years from today and it would work perfectly."

Matthew Brown, a General Manager at Toray, testified in his deposition that, in his view, aged film was a "generalization" that "specifie[d] film that [he] want[ed] the sales folks to focus on because it's been around for a while." Like Schloesser, he also stated at trial that "from a sales and operations point of view . . . there is no aged film." National Plastics' Goderstad testified that he understood "aged film" to mean generally "material that they made and didn't go out right away, so they put it in inventory, they held it for one reason or another." He said he wasn't "sure" about the physical age of "aged film," but thought it could be anywhere between three and eighteen months old.

The parties stipulated that between November 1, 2007, and August 31, 2012, Toray sold approximately 9.2 million pounds of film older than twelve months to entities other than National Plastics and had earned revenue on those sales totaling $16,836,907.91. In his closing argument, counsel for National Plastics argued to the jury that, if the jury found that Toray had breached the Settlement Agreement by selling aged film to entities other than National Plastics, the jury should calculate damages by multiplying Toray's revenue by National Plastics' twelve percent commission under the Settlement Agreement, for a total of $2,020,428.70. Counsel for Toray contended in his closing that

-7-

this damages figure was "pure speculation" because National Plastics had failed to show that it "could have sold [the aged film] at the same prices in the same marketplace [as Toray]."

The jury found Toray liable for breach of the Settlement Agreement and awarded National Plastics $2,020,428.95 in damages. Since that figure is equal to twelve percent of $16,836,907.91, it is apparent that the jury adopted National Plastics' proposed method of calculating damages. After the verdict, Toray renewed its earlier motion for judgment as a matter of law. The motion rested on two grounds: (1) National Plastics failed to present sufficient evidence that the parties intended the term "aged film" to mean all film thirteen or more months old, and (2) the jury's damages award was impermissibly speculative because National Plastics failed to present evidence that it would have generated the same revenue from selling aged film as Toray did. The district court summarily denied the motion, finding that the jury's verdict was "a rational determination of the credibility of the witnesses and the facts as derived from the evidence" and "a reasonable application of the facts to the law." The court entered final judgment in favor of National Plastics. This appeal followed.

## II.

We first address Toray's claim that the district court erred in allowing National Plastics to amend its complaint to add a jury demand.

Under Federal Rule of Civil Procedure 38(b), "a party may demand a jury trial by . . . serving the other parties with a written demand . . . no later than 14 days after the last pleading directed to the issue is served."  "A party waives a jury trial unless its demand is properly served and filed."  Fed. R. Civ. P. 38(d).  However, the district court may, in its discretion, excuse a party's waiver of a jury trial.  <u>See</u> Fed. R. Civ. P. 39(b); <u>Rowlett</u> v. <u>Anheuser-Busch, Inc.</u>, 832 F.2d 194, 199-200 (1st Cir. 1987), <u>abrogated on other grounds by</u> <u>Iacobucci</u> v. <u>Boulter</u>, 193 F.3d 14 (1st Cir. 1999).  "[T]he discretion under Rule 39(b) is very broad and . . . the case would be very rare indeed where a district court abused its discretion in denying <u>or</u> granting a Rule 39(b) motion."  <u>Rowlett</u>, 832 F.2d at 200; <u>see also</u> <u>Moores</u> v. <u>Greenberg</u>, 834 F.2d 1105, 1109 (1st Cir. 1987); 9 Wright & Miller, <u>Federal Practice and Procedure</u> § 2334 (3d ed.) (explaining that "the appellate courts ordinarily will not intervene or overturn the action taken by the trial judge" on a Rule 39(b) motion).  Indeed, Toray admits in its reply brief that it can cite to no case in which a district court's allowance of a Rule 39(b) motion "was grounds for reversal of a jury verdict on appeal."

In deciding Rule 39(b) motions, courts have considered various factors, such as

> (1) whether the case involves issues which are best tried to a jury; (2) whether granting the motion would result in a disruption of the court's schedule or that of the adverse party;

-9-

> (3) the degree of prejudice to the adverse party; (4) the length of the delay in having requested a jury trial; and (5) the reason for the movant's tardiness in requesting a jury trial.

Parrott v. Wilson, 707 F.2d 1262, 1267 (11th Cir. 1983); accord Daniel Int'l Corp. v. Fischbach & Moore, Inc., 916 F.2d 1061, 1064 (5th Cir. 1990). Any inquiry into the propriety of a Rule 39(b) motion is thus a highly fact-specific endeavor. See 9 Wright & Miller, supra, § 2334 ("The trial court ought to approach each application under Rule 39(b) with an open mind and an eye to the factual situation in that particular case . . . .").

On these facts, it was not an abuse of discretion for the district court to allow National Plastics to amend its complaint to add a jury demand. The district court found, and Toray does not contest, that the issues in this case were suited to jury determination. The allowance of the motion to amend did not disrupt the schedule of the litigation; at the time of the amendment, discovery was still in its early stages due to the parties' earlier efforts "to resolv[e] the matter as opposed to litigat[e] it." Moreover, Toray has conceded that it suffered no prejudice as a result of the amendment in terms of its ability to prepare for trial, since it had two and a half years after the amended complaint was filed to ready its case.[2] Cf. Rowlett, 832

---

[2]     This case is a far cry from Ypsilanti Community Utilities Authority v. Meadwestvaco Air Systems, LLC, No. 07-CV-15280, 2010 WL 1644058 (E.D. Mich. Apr. 22, 2010), which Toray cites in its

-10-

F.2d at 200 (affirming district court's grant of a Rule 39(b) motion after finding that defendant "was not prejudiced" because "the trial was not delayed or extended, nor was there any unfair surprise").

The time period that elapsed between National Plastics' filing of the initial complaint and its demand for a jury trial was significant, to be sure, and such a long delay would ordinarily counsel against excusing a jury waiver. But we agree with the district court that the reason offered for the delay -- emphasis on settlement negotiations -- was valid in the context of this case. In June 2010, the Magistrate Judge, sensing that the parties were progressing toward settlement, had imposed a "moratorium" on discovery with the goal of further facilitating negotiations, and the judge lifted the discovery stay in July 2010 on the

brief. There, the district court denied a Rule 39(b) motion that defendants filed "just two days before the final pre-trial conference," after the court had denied defendants' motion for summary judgment, and after the plaintiffs had "made several strategic decisions in the course of preparing th[e] case for trial based upon the belief that th[e] case would be tried to the bench." Id. at *2-3. Here, the Rule 39(b) motion was filed two and a half years before trial, long before any major strategic decisions had been made.

This case is likewise distinguishable from Olympia Express, Inc. v. Linee Aeree Italiane, S.P.A., 509 F.3d 347 (7th Cir. 2007), also relied on by Toray. In Olympia Express, the Seventh Circuit held that it would not excuse plaintiffs' four-year delay in requesting a jury trial in a suit brought under the Foreign Sovereign Immunities Act, in view of the "practical concerns of preparation and predictability" and "[t]he purpose of foreign sovereign immunity." Id. at 352. The doctrine of foreign sovereign immunity is not implicated in this case, nor is there any suggestion that the amendment disrupted Toray's preparation for trial.

understanding that the parties would not take any steps to "interfere with settlement negotiations." It was thus reasonable for National Plastics to delay its request for a jury trial until it became clear that settlement would not be forthcoming. This was not, as Toray would have it, simply a case of an unexplained last-minute change in tactics.

In view of these considerations, this is not one of the "very rare" cases in which a district court abused its discretion by granting a Rule 39(b) motion. See Rowlett, 832 F.2d at 200. We stress, though, that a party takes a considerable risk in delaying the making of a jury demand.

III.

In its second claim of error, Toray argues that National Plastics' claim for breach of the Settlement Agreement should not have gone to the jury because National Plastics failed to present sufficient evidence to establish that the parties had a mutual understanding of the term "aged film" as all film older than one year. We are not persuaded.

Under Federal Rule of Civil Procedure 50, the court may grant judgment as a matter of law to a party on an issue if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the [nonmoving] party on that issue." We review a district court's denial of a Rule 50 motion de novo, "viewing the evidence in the light most favorable

to the nonmoving party." Monteagudo v. Asociación de Empleados del Estado Libre Asociado de P.R., 554 F.3d 164, 170 (1st Cir. 2009) (quoting Marcano Rivera v. Turabo Med. Ctr. P'ship, 415 F.3d 162, 167 (1st Cir. 2005)) (internal quotation marks omitted). "[A] party seeking to overturn a jury verdict faces an uphill battle," since "[c]ourts may only grant a judgment contravening a jury's determination when the evidence points so strongly and overwhelmingly in favor of the moving party that no reasonable jury could have returned a verdict adverse to that party." Id. (quoting Marcano Rivera, 415 F.3d at 167) (internal quotation marks omitted).

Toray cannot meet that stringent standard here. As the jury was correctly instructed, its objective in construing the terms of the Settlement Agreement was "to ascertain the intent of the parties." Haffenreffer v. Haffenreffer, 994 A.2d 1226, 1233 (R.I. 2010) (citing The Elena Carcieri Trust-1988 v. Enter. Rent-A-Car Co. of R.I., 871 A.2d 944, 947 (R.I. 2005)). There is sufficient evidence in the trial record upon which a reasonable jury could have concluded that the parties intended the term "aged film" to mean all film thirteen or more months old.

First, there was evidence that Toray documents and testimony from the First Lawsuit had defined "aged film" in such a manner. For example, Toray's Answer to National Plastics' counterclaim in that suit stated that "Excess Material means

material that does not meet specification and includes <u>material that is aged (over 12 months)</u> or obsolete," and Schloesser testified that "aged material" is "film generally that reaches one year." These documents and testimony were available to National Plastics prior to the execution of the Settlement Agreement. Thus, contrary to Toray's argument, Toray's internal definition of the term "aged," insofar as it became public record during the First Lawsuit, could have influenced National Plastics' understanding of the term "aged film" as it is used in the Settlement Agreement.

Second, Toray CEO Schloesser equated the term "aged" with "13 months [old]" in his trial testimony. And finally, Toray CFO Jose testified that Toray took a financial reserve against film older than one year, and Toray Demand Manager John Angelina stated that "aged film" was "film that a financial reserve has been taken against." Taken together, this evidence suggests that, at the time Toray and National Plastics were negotiating the Settlement Agreement, <u>both</u> parties understood the term to mean film thirteen months old or older -- or at least a reasonable jury could so conclude.

IV.

Finally, Toray contends that National Plastics failed to present sufficient evidence to allow a jury to conclude with reasonable certainty that National Plastics suffered $2,020,428.95 in damages as a result of Toray's breach of the Settlement

-14-

Agreement. Toray makes two arguments in support of this contention: first, that National Plastics offered no evidence tending to show that it would have been able to sell aged film for the same price and to the same customers as Toray sold it; and second, that National Plastics failed to present any evidence as to the costs it would have incurred in selling aged film.

We do not consider Toray's argument regarding National Plastics' costs because it was not preserved. At no point in the trial did Toray argue that the proper measure of damages involved deducting National Plastics' operating costs from its anticipated revenues, nor did Toray ask for such an instruction to be given to the jury. The issue had not been raised at all, even in Toray's motion for judgment as a matter of law under Rule 50.[3] As Toray admits, it made two, and only two, arguments in support of its Rule 50 motion: (1) National Plastics failed to present sufficient evidence to show a mutual understanding of the meaning of the term "aged film" and (2) National Plastics failed to present evidence that would allow a reasonable jury to conclude that it would have generated the same revenues from selling "aged film" as Toray did.[4]

_____

[3] Indeed, the parties did not even conduct discovery on costs.

[4] Toray's full argument in support of its motion for judgment as a matter of law with respect to the damages issue, made at the close of National Plastics' case, was as follows:

> There is no evidence whatsoever as to what Mr. Goderstad would have sold those products at, at what pricing and to whom. He simply

-15-

Those contentions were not sufficient to preserve the costs argument. A Rule 50 motion "must be sufficiently specific so as to apprise the district court of the grounds relied on in support of the motion." Monteagudo, 554 F.3d at 170 (quoting Parker v. Gerrish, 547 F.3d 1, 12 (1st Cir. 2008)) (internal quotation marks omitted). Arguments not "spell[ed] out . . . squarely and distinctly" in the district court are waived. United States v. Samboy, 433 F.3d 154, 161 (1st Cir. 2005) (quoting Rivera-Gomez v. de Castro, 843 F.2d 631, 635 (1st Cir. 1988)) (internal quotation marks omitted); see also Monteagudo, 554 F.3d at 170-71; Parker, 547 F.3d at 12 (noting that a Rule 50 motion "preserves for review only those grounds specified at the time, and no others" (quoting Zachar v. Lee, 363 F.3d 70, 73 (1st Cir. 2004)) (internal quotation marks omitted)). Toray's argument that the evidence did not show that National Plastics would have generated the same <u>revenues</u> from selling "aged film" as Toray did was not sufficient to put the district court on notice of its costs

> engaged in the pure speculation that he is entitled to 12 percent of what Toray sold those products to [*sic*] and its pricing to its customers and its marketplaces. There's no connection here with any evidence as to what Mr. Goderstad's company actually could have sold the products for, to whom, when and in what amounts. His 12 percent is based on his figures under the contract, not ours.

This was not enough to make clear to the trial judge the theory that Toray now advances about deduction of operating costs. Toray's renewed motion for judgment as a matter of law simply reiterated this argument.

-16-

argument. Nor was Toray's general argument that the requested damages award was speculative sufficient; that contention was too vague to encompass the costs argument, especially since the issue had not been raised to the court or to the jury at any earlier point. Toray simply did not "spell out its [costs] argument[] squarely and distinctly" as is required to raise it on appeal. See Samboy, 433 F.3d at 161 (internal quotation marks omitted).[5]

We addressed Toray's first preserved argument above; we now turn to the second.

As the district court correctly instructed the jury, under Rhode Island law, "'[t]he amount of damages sustained from a breach of contract must be proven with a reasonable degree of certainty, and the plaintiff must establish reasonably precise figures and cannot rely upon speculation.'" Guzman v. Jan-Pro Cleaning Sys., Inc., 839 A.2d 504, 508 (R.I. 2003) (alteration in original) (quoting Mktg. Design Source, Inc. v. Pranda N. Am., Inc., 799 A.2d 267, 273 (R.I. 2002)) (internal quotation marks omitted). "However, [p]laintiffs will not be denied recovery merely because the damages . . . are difficult to ascertain, as long as they prove damages with reasonable certainty." Sophie F. Bronowiski Mulligan Irrevocable Trust v. Bridges, 44 A.3d 116, 120

---

[5] Ordinarily, to be clear, a plaintiff seeking damages for breach of contract is required to show evidence of lost profits, as opposed to lost revenues. See, e.g., Troutbrook Farm, Inc. v. DeWitt, 611 A.2d 820, 824 (R.I. 1992).

-17-

(R.I. 2012)(alterations in original)(citations omitted)(internal quotation marks omitted); see also Smith Dev. Corp. v. Bilow Enters., Inc., 308 A.2d 477, 483 (R.I. 1973) (noting that "'absolute certainty in proving . . . quantum [of damages] is not required'" and that the jury need only "be guided by some rational standard" (citations omitted)).

There was evidence in the record upon which a reasonable jury could conclude that National Plastics established the damages from Toray's breach with reasonable certainty. In an e-mail that Toray CFO Jose sent to Goderstad after the execution of the contract, Jose stated that he understood that National Plastics had been buying the agreed materials from Toray, invoicing its own customer for the same amount as it had paid Toray for the materials, then receiving its twelve percent commission based on that amount. Jose proposed instead that Goderstad raise the prices that National Plastics was charging to a level such that, after the twelve percent commission was deducted, Toray would "receive the same level of pricing (or pretty close to it) that [it] did prior to [the Settlement Agreement]." That suggests, at a minimum, that National Plastics could in fact sell the product for prices similar to those of Toray. Moreover, Toray was obligated under the Settlement Agreement to share sales leads regarding the agreed materials with National Plastics, suggesting that the customer bases and sales volumes of the two companies would be comparable.

-18-

A reasonable jury could conclude from this evidence that twelve percent of Toray's revenues from direct sales of aged film to third parties -- sales that, under the Settlement Agreement, should have been done through National Plastics -- was a rational estimate of damages.

Toray resists this conclusion, arguing that it "routinely" sold film thirteen months old or older to its regular customers without discount and including a warranty. Because National Plastics could not sell plastic film into primary markets complete with warranty, Toray contends, it is not possible that National Plastics could have earned the same revenues from sales of the film as Toray did. But this argument rests on the premise that film thirteen months old or older had no operational difference from film less than one year old and could be sold into prime markets at the prime market price. The jury did not have to accept that premise or credit the testimony of the witnesses who testified to its validity. Instead, the jury could have inferred, based on the evidence that Toray took an accounting reserve against film at age thirteen months, that the film became less valuable at that point and thus was likely to be moved to a broker for sale into a secondary market without a warranty.

George v. George F. Berkander, Inc., 169 A.2d 370 (R.I. 1961), the case upon which Toray places principal reliance, does not compel a different result. In George, the plaintiff had

-19-

licensed the defendant to use a manufacturing process invented by the plaintiff. Id. at 370-71. The defendant agreed to pay the plaintiff a royalty for items made and sold using the process and to sell such items only outside of Rhode Island. Id. at 371. When the defendant sold items in Rhode Island in contravention of the agreement, the plaintiff sued and sought to recover the defendant's profits as part of his damages. Id. The Rhode Island Supreme Court, adhering to the traditional "expectation" measure of damages famously articulated in Hadley v. Baxendale, 9 Exch. 341 (1854), held that the plaintiff's request was impermissible because the plaintiff had presented no evidence that it would have earned those profits had the defendant fulfilled the terms of the contract. See George, 169 A.2d at 372-73. George simply stands for the familiar proposition that the proper measure of damages in a breach of contract action is that which "will serve to put the injured party as close as is reasonably possible to the position he would have been in had the contract been fully performed." Id. at 372. As explained above, in this case, a reasonable jury could have concluded that a damages award equal to Toray's revenues from selling film older than one year accomplished that purpose. Cf. RBC Nice Bearings, Inc. v. SKF USA, Inc., 78 A.3d 195, 212 (Conn. App. Ct. 2013) (holding that defendant alleging breach of a contract under which it was the exclusive distributor of certain products could use the plaintiffs' profits from sales of those

-20-

products to other parties as its measure of damages because "it would be neither speculative nor too remote . . . to conclude that the defendant, the exclusive distributor of [those products], would have been in the position to sell the product[s] to the customers who purchased directly from the plaintiffs").

In further support of its argument that the jury's damages award in this case was speculative, Toray cites several antitrust cases applying the "yardstick" method of damages measurement, under which a plaintiff can "measure its damages with reference to the performance of one or more closely comparable firms in the same industry that, unburdened by the proscribed anticompetitive activity, successfully managed to earn profits." Home Placement Serv., Inc. v. Providence Journal Co., 819 F.2d 1199, 1205-06 (1st Cir. 1987). We find these cases unhelpful in the present context. This is not an antitrust case; it is an action for breach of contract, and a unique one at that. In order to settle pending claims against each other, Toray and National Plastics agreed to do business together over a seventeen-year period pursuant to the terms of a Settlement Agreement honed through extensive negotiation. And as described above, a jury could reasonably conclude, based on evidence of the parties' intent, that twelve percent of Toray's revenues from its breaching the Settlement Agreement was a reasonable estimate of National Plastics' loss as a result of Toray's refusal to do business

according to the agreement's terms.  No more is required under Rhode Island law.

V.

We <u>affirm</u> the decision of the district court.  Costs are awarded to National Plastics.