# United States Court of Appeals

## For the First Circuit

No. 19-1935

DAMARIS SANTOS-ARRIETA, in representation of her minor son
G.Q.S.; GUSTAVO QUERALES-SALCEDO, in representation of his minor
son G.Q.S.; G.Q.S., minor represented by his parents Damaris
Santos-Arrieta and Gustavo Querales-Salcedo,

Plaintiffs, Appellants,

v.

HOSPITAL DEL MAESTRO, or alternatively, John Doe Corporation,
d/b/a Hospital Del Maestro; CONTINENTAL INSURANCE COMPANY,

Defendants, Appellees,

DR. FELIX VILLAR-ROBLES, in representation of his conjugal
partnership; JANE DOE, in representation of her conjugal
partnership; JOHN DOES 1, 2 AND 3; CONJUGAL PARTNERSHIP VILLAR-
DOE; PUERTO RICO MEDICAL DEFENSE INSURANCE COMPANY,

Defendants.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Marcos E. López, Magistrate Judge]

---

Before

Thompson and Lipez, Circuit Judges,
and Laplante,* District Judge.

---

David Efron, with whom Etienne Totti del Toro and Law Offices
of David Efron, PC were on brief, for appellants.
Jeannette López de Victoria, with whom Nuyen Marrero Bonilla

---

* Of the District of New Hampshire, sitting by designation.

and <u>Sánchez Betances, Sifre & Muñoz Noya, P.S.C.</u> were on brief,
for appellees.

_____

September 15, 2021

_____

**THOMPSON**, <u>Circuit Judge</u>.  After a less-than-typical six-day trial in this medical-malpractice case, Plaintiffs Damaris Santos-Arrieta, Gustavo Querales-Salcedo, and their minor child G.Q.S. (altogether the "Plaintiffs") walked away with a jury verdict of just under $5 million, compensating them for the brain damage that Hospital del Maestro ("the Hospital" for short) and Dr. Felix Villar-Robles ("Dr. Villar") negligently caused G.Q.S. at his birth.  The Hospital, convinced that it's now on the hook for damages it didn't cause, filed post-trial motions to knock that number down (or out completely).  The district court took up the Hospital's request and used the post-trial motions as an opportunity to reconsider its in-trial ruling on the admissibility of the life-care-planning expert's testimony--even though the Hospital had ditched that argument pre-verdict.  Reversing course from its ruling at trial, the district court struck the testimony of the only expert on future costs, deemed a new trial unnecessary, and accordingly entered an amended judgment wiping out just over $3 million (about 60%) of the verdict (<u>i.e.</u>, the jury's calculation of the future costs of G.Q.S.'s care).  Plaintiffs, rattled by the post-trial maneuver, ask us to revive the judgment or, in the alternative, remand for a new trial on only future costs.  Spying legal error in the district court's grant of judgment as a matter of law, we vacate the entry of amended judgment and remand for further proceedings.

**BACKGROUND**

This dispute arises out of the birth of G.Q.S. at the Hospital in San Juan, Puerto Rico.[1] In 2009, G.Q.S.'s mother, Damaris Santos-Arrieta ("Santos"), was under the care of Dr. Villar.[2] Dr. Villar scheduled Santos for a Cesarean section, commonly known as a C-section, at the Hospital. According to Plaintiffs, the defendants engaged in a series of gaffes related to G.Q.S.'s delivery, all resulting in his now having varied physical and cognitive health care issues. And, Plaintiffs say, these issues are all symptoms of brain damage, which the negligent care from the Hospital caused.

The Hospital steadfastly disagrees.[3] The Hospital's theory of the case has been consistent throughout: Based on the record evidence, G.Q.S. has autism, not brain damage and accordingly, all of G.Q.S.'s physical, developmental, and behavioral symptoms are attributable to that alone. And, because there is no scientifically valid evidence to prove a link between the Hospital's care and G.Q.S.'s autism, it cannot be held liable here.

---

[1] For the record, this is a diversity-jurisdiction case, because Plaintiffs are now citizens of Florida. 28 U.S.C. § 1332.

[2] Dr. Villar and his insurer settled on the morning of trial, so he's not with us on appeal here.

[3] When we talk about the Hospital's legal arguments and maneuvers, we're also referring to those of its named-defendant insurer, Continental Insurance Company, because they're represented by the same counsel.

The autism-versus-brain-damage debate became the center of three motions in limine before trial.[4] Two of those motions in limine are relevant here. The first is the defendants' motion to exclude Plaintiffs' life-care planning expert, Gerri Pennachio. Pennachio's life-care plan was designed to give a reasonable estimate of the costs of caring for G.Q.S. for the rest of his life. The defendants argued that Pennachio's calculations were based on caring for G.Q.S.'s diagnosis of autism, which the court, siding with the defendants on this point, had recently ruled off the table as a source of damages.[5] So, they argued, the estimates of the costs were too speculative and would confuse the jury into awarding damages based on autism, not brain damage.

The district court granted the motion to exclude Pennachio's testimony on the same day as jury selection. In its opinion and order, the district court didn't specify which Rule (or Rules) of Evidence it was applying and did not cite any case law in support of its ruling. But it reasoned that Pennachio's testimony was inadmissible because "there is no readily apparent way in which to subdivide the plan into expenses related to autism

_____

[4] A magistrate judge presided over both the pre-trial proceedings and the trial, as the parties consented to proceeding before a magistrate judge. See 28 U.S.C. § 636(c)(1).

[5] In its ruling on another motion in limine, the district court concluded there was no scientifically reliable evidence presented showing that the defendants' actions could cause autism, autism spectrum disorder, or autistic-like behaviors. Plaintiffs have not appealed that ruling.

-5-

and expenses not related to autism." The district court surveyed the references to autism in the life-care plan, and also concluded that there was no way "to determine if the plaintiff's needs are attributed to his autism exclusively, or if any of his other conditions would require the same expenditures." For that reason, the court precluded Pennachio from testifying. Plaintiffs have not appealed that ruling.

The second relevant motion in limine sought to exclude the testimony of Dr. Richard Katz, the defendants' life-care-planning expert. That motion has its own procedural backdrop. Dr. Katz became the center of attention on appeal because Plaintiffs orally told the court that they intended to call the defendants' life-care-planning expert Dr. Katz in their case-in-chief. Faced with the exclusion of Pennachio, their only expert designated to opine on G.Q.S.'s future costs, Plaintiffs presumably saw Dr. Katz as the next-best thing. Although Dr. Katz was retained by the defendants, his life-care plan calculated G.Q.S.'s future costs to be well over $3 million.[6] So, before the Hospital filed its motion in limine, Plaintiffs sought to use Dr. Katz to plug the new void in their case. Over the Hospital's first set of objections, the district court ruled that Plaintiffs could call Dr. Katz. The court noted that Plaintiffs had reserved the

_____

[6] Plaintiffs' expert Pennachio estimated the cost to be $4,261,047.44.

-6-

right in their pre-trial memorandum to call any of the defendants' witnesses as their own.[7]  So, with that reservation in mind, the district court informed the Hospital that if it didn't make Dr. Katz available, the court would give an adverse instruction to the jury based on his absence.[8]

Later that evening, the Hospital slapped down the motion in limine.  This time, the Hospital said that the testimony of Dr. Katz should also be excluded from trial (the opening arguments of which were set to begin the next morning).  The district court denied the motion in a one-sentence order based both on the reasons offered in chambers the day before (i.e., that Plaintiffs reserved the right to call the defense's witnesses) and the motion's untimeliness.

But that wasn't the end of the fight over Dr. Katz, as we'll get to momentarily.  With all of the motions in limine

---

[7]  In federal court, it is within the district court's discretion to permit "a party [to] introduce the opinion testimony of the opposing party's expert," including by calling her at trial. 6 James Wm. Moore, Moore's Federal Practice § 26.80[1][a]; see also Nat'l R.R. Passenger Corp. v. Certain Temp. Easements, 357 F.3d 36, 42 (1st Cir. 2004) (holding no abuse of discretion in permitting a party to call in its case-in-chief the opposing party's expert); Kerns v. Pro-Foam of S. Ala., Inc., 572 F. Supp. 2d 1303, 1309 (S.D. Ala. 2007) (collecting cases).  The Hospital does not argue on appeal that the district court abused its discretion in permitting Plaintiffs to call Dr. Katz in their case-in-chief.  It argues only that Dr. Katz's testimony otherwise should not have been admitted under Rule 702.

[8] The Hospital was now alone (with its insurer, as we mentioned before) because Dr. Villar reached a settlement.

resolved, the jury was empaneled and began to hear the evidence. In Plaintiffs' case-in-chief, they proffered (among others) Dr. Carolyn Crawford to opine on G.Q.S.'s injury and its cause. As Dr. Crawford put it, her diagnosis was "brain damage, as a result of the combined effect of prematurity [(i.e., the C-section was scheduled too early)] and of lack of adequate oxygen and blood flow to his brain, so that functionally his brain is damaged."

After Plaintiffs put on most of their evidence, they had one last witness to call: Dr. Katz. But the Hospital had surprising news. Dr. Katz wasn't in Puerto Rico; he was in St. Louis. The Hospital complained that Dr. Katz shouldn't be admitted at all because his report was based on the costs for caring for autism, not brain damage. The district court, though, held firm. It reminded the Hospital that it had already denied the Hospital's motion in limine, and that it had informed the Hospital that if Dr. Katz wasn't there to testify, the court would give an adverse-inference instruction.[9] As the court later put it: "I have consistently stated that if Dr. Katz doesn't take the stand in this trial, I will be giving a missing witness instruction. I

_____

[9] The specific adverse-inference instruction the court proposed was a so-called missing-witness instruction. That "instruction informs the jury that a party's failure to produce a particular witness may justify the inference that the witness' testimony would have been unfavorable to that party." Latin Am. Music Co. v. ASCAP, 593 F.3d 95, 101 (1st Cir. 2010) (describing the missing-witness instruction and the considerations for a district court in whether to deliver one).

-8-

have not wavered about that. So either Dr. Katz testifies or there will be a missing witness instruction." So, the court held a brief recess to prepare the instruction, which would include Dr. Katz's future-costs figure of $3,684,080.

Off the record, the parties devised a solution at the district court's urging. To avoid the adverse instruction, the Hospital eventually agreed that it would get Dr. Katz to Puerto Rico to testify. Because he couldn't get there for a few days, the parties decided (with the district court's blessing) to call Dr. Katz in the defense's case, even though the Hospital didn't want to call him at all. They also agreed (later on) that the Hospital would take Dr. Katz on direct examination, even though he was really being used as Plaintiffs' witness. And with that plan in place, Plaintiffs rested--albeit without introducing any evidence of future costs.

The Hospital then moved orally under Federal Rule of Civil Procedure 50(a) for judgment as a matter of law, arguing that there was no "evidence of brain damage, and the only thing that we do have is the diagnosis of autism."[10] The district court

_____

[10] Rule 50(a) provides:
>    If a party has been fully heard on an issue
>    during a jury trial and the court finds that
>    a reasonable jury would not have a legally
>    sufficient evidentiary basis to find for the
>    party on that issue, the court may . . .
>    resolve the issue against the party; and . . .
>    grant a motion for judgment as a matter of law

denied the motion, concluding that it was for the jury to decide whether G.Q.S. had brain damage, autism, or both.

Onward the trial went to the defense's case, where we at last find Dr. Katz's testimony. Before Dr. Katz took the stand, the district court cautioned the parties about the scope of Dr. Katz's testimony. It warned that the parties were not to ask what it cost to treat autism, given the court's prior ruling.

But then the court added something anew, which now has surfaced as the cornerstone of this appeal. Walking back a bit from its order denying the Hospital's motion in limine, the district court signaled that the admission of the testimony was only conditional. The court told the parties that it wasn't quite sold on whether to admit Dr. Katz's testimony, so it would use the trial as a sort-of Daubert hearing.[11] As the district court put it: "[If] [a]fter I hear all the testimony of Dr. Katz, I reach

    against the party on a claim or defense that,
    under the controlling law, can be maintained
    or defeated only with a favorable finding on
    that issue.

Fed. R. Civ. P. 50(a)(1). It further provides: "A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury. The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment." Id. R. 50(a)(2).

[11] A Daubert hearing is an evidentiary hearing (often conducted in limine, i.e., preliminarily and only to the judge, In Limine, Black's Law Dictionary (11th ed. 2019)) used by district courts to resolve factual issues related to admissibility. See Daubert v. Merrell Dow Pharms., Inc., 43 F.3d 1311, 1319 n.10 (9th Cir. 1995) (defining a Daubert hearing); see also Fed. R. Evid. 702.

-10-

the conclusion that his numbers are based exclusively on autism, well, I might have to strike his testimony and order the jury to disregard his testimony." The court explained that Dr. Katz's proposed testimony didn't seem to be as bound up in autism as Pennachio's opinion, but that it would need to be teased out in the testimony what role autism played in the calculations.

Dr. Katz, a physician board-certified in physical medicine and rehabilitation, then gave his testimony. Opining as a life-care-planning expert, Dr. Katz was tasked with calculating how much it would cost to care for G.Q.S. for the rest of his life. The figure he gave the jury in this case was $3,634,080. On the district court's key question of what that was based on (autism, brain damage, or a combination of the two), Dr. Katz tried to explain the underpinnings of his analysis. He testified at certain points that he looks at the diagnosis, that "the diagnosis helps," and that it isn't as if "the diagnosis is unimportant." At other points, he also testified that the diagnosis of autism wasn't the "main issue" in his analysis; it was the needs of the patient. And in response to questions the judge posed, Dr. Katz testified that many of the costs would "overlap" between autism and brain damage, and that even if G.Q.S. "didn't have a label autism," he would "still need these things" in the life-care plan.

After that testimony, the district court asked if the parties had any objection to Dr. Katz's testimony being admitted.

Both the Hospital and Plaintiffs said no.  So, the district court ruled Dr. Katz's testimony admitted in full without objection, closing arguments were delivered, and the jury was charged and sent to deliberate.

Then the jury returned with a verdict for Plaintiffs to the tune of $4,948,968.  Of that total sum, the jury divvied up the separate damages as follows:  $651,000 for physical injuries, $1,209,000 for pain and suffering, and $3,088,968 for future expenses (Dr. Katz's area of expertise).  And the jury laid 70% of the blame on the Hospital, and 30% on Dr. Villar, leaving the Hospital with a hefty bill of almost $3.5 million.

Taken aback by the jury verdict, the Hospital filed simultaneously two post-trial motions:  a renewed motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) and a motion for new trial under Rule 59(a)(1)(A).[12]  The

_____

[12] Rule 50(b) provides:

> If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion.  No later than 28 days after the entry of judgment—or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged—the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59.  In ruling on the renewed motion, the court may . . . allow judgment on the verdict, if the jury returned

-12-

gist of both motions was that the Hospital didn't think there was any evidentiary basis to find liability. In its Rule 50(b) motion, the Hospital pressed that there was absolutely no evidence that its negligence could have caused any brain damage to G.Q.S. or G.Q.S.'s autism. The Rule 59(a) motion took on four specific issues. First, it argued that Dr. Katz's testimony was highly prejudicial to the Hospital and should've been excluded. Second, it argued that there was no evidence that the Hospital's actions caused G.Q.S.'s injuries because his only diagnosed condition was autism. Third, it argued that the apportionment of damages between Dr. Villar and the Hospital was against the weight of the evidence. And finally, it argued that the jury's verdict should be reduced because it was excessive (in legalese, we call this remittitur). Plaintiffs, of course, strenuously objected and argued the court should leave the chips where they landed.

The district court mostly agreed with the Hospital but, on its own initiative, reorganized the arguments. It denied the Rule 50(b) motion as to causation, concluding there was ample

a verdict; . . . order a new trial; or . . . direct the entry of judgment as a matter of law.
Fed. R. Civ. P. 50(b).
    Rule 59(a)(1)(A) provides that "[t]he court may, on motion, grant a new trial on all or some of the issues--and to any party-- . . . after a jury trial for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]"

evidence in the record that the Hospital's actions could have caused brain damage to G.Q.S. As to Dr. Katz, the district court slid the Hospital's argument (contained in its Rule 59(a) motion) over to the Rule 50(b) analysis. The district court "reconsidered its position" at trial and concluded that "Dr. Katz's testimony should have been disallowed or . . . the jury should have been instructed to disregard it." According to the district court, Dr. Katz's testimony "suffer[ed] from the same vulnerability that prompted the exclusion of Ms. Pennachio's testimony": his opinion was "inextricably intertwined with GQS's autism," which the district court had previously determined had no evidentiary link in the record to any negligent conduct. And, because the district court concluded there was no evidence of future costs besides Dr. Katz's testimony, which "should have been disallowed," it set aside the entire future-costs verdict of just over $3 million and entered an amended judgment accordingly. Again, the district court did not cite any Rules of Evidence or case law supporting this reconsidered admissibility determination.

As to the Rule 59(a) motion, the district court denied it. The court saw no need for a new trial on future costs because of its ruling in the Rule 50(b) portion of the opinion reconsidering the admissibility of Dr. Katz's testimony. The court also rejected the Hospital's arguments that a new trial was necessary because the jury's conclusions on causation and

-14-

apportionment of liability were against the weight of the evidence. And, as to remittitur, the district court concluded that, after subtracting the future-costs damages, there was nothing warranting reduction in the remaining jury verdict. The court did not conditionally rule on the Rule 59(a) motion in the event the judgment as a matter of law was reversed or vacated.

Plaintiffs appealed from the order granting the Rule 50(b) motion. Now it's our turn to dive in, adding some more detail to these facts as they become more relevant to our analysis.

## DISCUSSION

Plaintiffs start with two procedural objections to the way things went down below. First, they argue that the district court lacks the authority to change the evidentiary record from trial in considering a Rule 50 motion. Second, they contend that the district court went afield and granted judgment as a matter of law on grounds not raised by the Hospital in its Rule 50(a) or Rule 50(b) motions, which it isn't permitted to do. We start and end with the second argument.[13]

---

[13] One note on Plaintiffs' first argument, though. We haven't yet decided this issue, and, given the analysis we're about to explain, we can ultimately leave it for another day. But, for the benefit of future readers, the case law casts doubt on Plaintiffs' proposition, including Supreme Court precedent calling out some of the cases Plaintiffs cite. See Weisgram v. Marley Co., 528 U.S. 440, 453-57 (2000) (describing this proposition, and specifically three of the cases our Plaintiffs cited in their brief, as being "of questionable consistency with Rule 50(a)(1)" (citing, among others, Schudel v. Gen. Elec. Co., 120 F.3d 991, 995-96 (9th Cir.

-15-

As a brief primer, a motion under Rule 50(b) is a "renewed" version of a party's motion brought under Rule 50(a). See Fed. R. Civ. P. 50(b). The difference between the two subsections is that a Rule 50(a) motion is "made at any time before the case is submitted to the jury," id. R. 50(a)(2), whereas a Rule 50(b) motion comes after the jury is discharged, id. R. 50(b). A proper Rule 50(a) motion is a prerequisite to a proper Rule 50(b) motion. "A Rule 50(b) motion cannot be used to introduce 'a legal theory not distinctly articulated' in the Rule 50(a) motion." RFF Family P'ship, LP v. Ross, 814 F.3d 520, 537 (1st Cir. 2016) (quoting Parker v. Gerrish, 547 F.3d 1, 12 (1st Cir. 2008)); see Zachar v. Lee, 363 F.3d 70, 74 (1st Cir. 2004) ("The grounds for the renewed motion under Rule 50(b) are limited to those asserted in the earlier Rule 50(a) motion.").

---

1997); Jackson v. Pleasant Grove Health Care Ctr., 980 F.2d 692, 695-96 (11th Cir. 1993); Midcontinent Broad. Co. v. N. Cent. Airlines, Inc., 471 F.2d 357, 358 (8th Cir. 1973))). Since Weisgram, some courts have concluded that a district court's Rule 50 ruling should be based only on admissible evidence and that a district court may reconsider the admissibility of the evidence submitted to the jury in weighing the Rule 50 motion. See, e.g., Goodman v. Pa. Tpk. Comm'n, 293 F.3d 655, 665 (3d Cir. 2002); United States ex. rel. Salinas Constr., Inc. v. W. Sur. Co., No. C14-1963JLR, 2016 WL 3632487, at *6 & n.9 (W.D. Wash. July 7, 2016) (observing that "[d]istrict courts consider Weisgram to stand for the proposition that in determining whether there is a legally sufficient evidentiary basis for the verdict, erroneously admitted evidence will play no role in the court's application of the appropriate legal standard," and collecting cases (citation omitted)).

-16-

We review de novo the district court's operation of this standard here. See Lawes v. CSA Architects & Eng'rs LLP, 963 F.3d 72, 90 (1st Cir. 2020). Our review finds error.

In its ruling on the Rule 50(b) motion, the district court took on a reexamination of the admissibility of Dr. Katz's testimony. Yet, as the Hospital admits, its Rule 50(b) motion doesn't mention Dr. Katz's testimony or make an argument that the evidence was insufficient to support the verdict of future costs on which Dr. Katz opined. The only argument that the Hospital made regarding damages in its Rule 50(b) motion was that there was no evidence to support any of the damages because there was no evidence supporting liability. Instead, the Hospital points to the discussion of Dr. Katz's testimony in its Rule 59(a) motion and dubs the location of these arguments mere differences in "procedural vehicle[s]"--although it doesn't cite case law supporting its implicit argument that Rule 59(a) arguments can be used as a basis to enter judgment as a matter of law.

Given the unique procedural history of this case, we disagree with the Hospital that the procedural vehicle to which it moored its evidentiary argument is irrelevant. Rather, we conclude that the absence of any argument in either its Rule 50(a) or Rule 50(b) motion that Dr. Katz's testimony should be excluded renders the district court's sua sponte tackling of the future-costs issue error.

As we've explained, the scope of a Rule 50(b) motion is confined to those grounds raised in the Rule 50(a) motion. Thus, we require that the Rule 50(a) motion be "sufficiently specific so as to apprise the district court of the grounds relied on in support of the motion." T G Plastics Trading Co. v. Toray Plastics (Am.), Inc., 775 F.3d 31, 39 (1st Cir. 2014) (quoting Monteagudo v. Asociacion de Empleados del Estado Libre Asociado, 554 F.3d 164, 170 (1st Cir. 2009)). The Rule 50(b) renewal requirement serves two purposes. First, it "alert[s] the opposing party to the movant's claim of insufficiency before the case goes to the jury, so that his opponent may possibly cure any deficiency in his case should the motion have merit." Robles-Vazquez v. Garcia, 110 F.3d 204, 206 (1st Cir. 1997) (quoting Martinez Moll v. Levitt & Sons of P.R., Inc., 583 F.2d 565, 569 (1st Cir. 1978)). And second, it allows the judge to "rule on the adequacy of the evidence without impinging on the jury's fact-finding province." Id. (quoting Martinez Moll, 583 F.2d at 569).

That reasoning reveals why, "[w]hile it is accepted that a judge may sua sponte grant a directed verdict pursuant to Fed. R. Civ. P. 50(a) . . .[,] allowing a judge to sua sponte raise a new issue post-verdict, and proceed to overturn a jury verdict on that basis contravenes the dictates of Rule 50(b)."[14] Id. at 207

---

[14] "Directed verdict" is the term the Rules used for a Rule 50(a) motion for "judgment as a matter of law" prior to the 1991

-18-

(second alteration in original) (quoting Am. & Foreign Ins. Co. v. Bolt, 106 F.3d 155, 159 (6th Cir. 1997)); accord Mountain Dudes v. Split Rock Holdings, Inc., 946 F.3d 1122, 1130 (10th Cir. 2019) ("district courts are limited by Rule 50 to granting judgment as a matter of law only on grounds raised by the parties"); Doe v. Celebrity Cruises, Inc., 394 F.3d 891, 903 (11th Cir. 2004) ("a district court does not have the authority under Rule 50(b) to rule sua sponte on issues not raised by the parties"); Murphy v. Long Beach, 914 F.2d 183, 186 (9th Cir. 1990) ("For the same reasons a party may not seek a JNOV on grounds not alleged in their motion for directed verdict, a district court may not enter a JNOV on grounds not asserted in a party's motion for directed verdict.")[15]; Kutner Buick, Inc. v. Am. Motors Corp., 868 F.2d 614, 617 (3d Cir. 1989) (reversing grant of Rule 50 motion on ground not presented by the party in either its pre-verdict or post-declaration-of-mistrial motion); Mozingo v. Correct Mfg. Corp.,

---

amendment. See Fed. R. Civ. P. 50 advisory committee's note to 1991 amendment. A motion for a directed verdict, like a Rule 50(a) motion, came before the case was sent to the jury. 9B Charles Alan Wright & Arthur B. Miller, Federal Practice and Procedure § 2521 (3d ed. 2021).

[15] "JNOV" (short for judgment non obstante veredicto) refers to a judgment notwithstanding the verdict, JNOV, Black's Law Dictionary (11th ed. 2019), which was yet another pre-1991 term, this time for a modern-day Rule 50(b) motion. Fed. R. Civ. P. 50 advisory committee's note to 1991 amendment. Like its successor, a motion for judgment n.o.v. was one made after the verdict was returned. 9B Wright & Miller, supra, § 2521.

752 F.2d 168, 172 (5th Cir. 1985) (reversing grant of Rule 50(b) motion where the party never argued the issue).[16]

This line of case law jibes with the plain text of Rule 50(b), which describes a post-verdict motion as a "renewed" version of the pre-verdict motion.  Fed. R. Civ. P. 50(b); see also id. advisory committee's note to 1991 amendment ("the post-verdict motion is a renewal of an earlier motion made at the close of the evidence," and "[a] post-trial motion for judgment can be granted only on grounds advanced in the pre-verdict motion").  As the Sixth Circuit explained, "it seems illogical . . . to permit a judge to overturn a jury verdict on his own motion, where the rule specifically forbids him to grant the same motion were it brought by one of the parties."  Am. & Foreign Ins. Co., 106 F.3d at 160. We agree.

Here, the procedural failure is twofold.  Not only did the Hospital fail to raise any discussion of Dr. Katz in a Rule

---

[16] HK Systems v. Eaton Corp., 553 F.3d 1086, 1089 (7th Cir. 2009), again not cited by the Hospital, isn't to the contrary. There, the Seventh Circuit affirmed the district court's entry of judgment as a matter of law post-trial where the defendant didn't raise the issue in its Rule 50 papers.  But there, the court was reconsidering its prior denial of a motion for summary judgment. See id.  So, although styled a Rule 50 ruling, it was a motion to reconsider.  Here, though, the district court reconsidered its prior evidentiary ruling, and then used that evidentiary ruling to enter an amended judgment as a matter of law based on the sufficiency of the evidence.  The district court's decision as to the admissibility of Dr. Katz's testimony could not be an independent basis to enter summary judgment.  So, HK Systems is different from the circumstance here.

-20-

50(a) motion pre-verdict, it also did not mention his testimony in its Rule 50(b) motion post-verdict. As to the failure to raise the issue pre-verdict, the Hospital has two retorts. First, the Hospital avers that its Rule 50(a) argument was sufficient to have preserved the exclusion of Dr. Katz as a basis for its Rule 50(b) motion. Yet, as the Hospital admits, both Rule 50 motions--pre- and post-verdict--concerned the purported lack of evidence that G.Q.S. had brain damage or that the Hospital caused his brain damage or autism. Neither motion ever once mentioned any Rule of Evidence or argued that any witness should not have testified. It is a far jump from saying there is insufficient evidence of causation to saying that a future-damages expert is inadmissible under some Rule of Evidence. The Hospital's motion was not "sufficiently specific" to preserve the admissibility argument. TG Plastics Trading Co., 775 F.3d at 39 (quoting Monteagudo, 554 F.3d at 170).

Second, the Hospital contends that it couldn't have argued about Dr. Katz in its Rule 50(a) motion because Dr. Katz had not yet testified at that point in the trial. Although the Hospital's chronicle of the timeline is true, the Hospital does not argue that it could not have made more than one Rule 50(a) motion at trial. See, e.g., Jackson v. Bunge Corp., 40 F.3d 239, 241 (7th Cir. 1994) (noting that, "[a]t the close of plaintiff's evidence, [defendant] filed two separate motions for judgment as

a matter of law pursuant to Rule 50" (emphasis added)); All. for Telecomms. Indus. Sols., Inc. v. Hall, No. CIV. CCB-05-440, 2007 WL 3224589, at *12 n.24 (D. Md. Sept. 27, 2007) (considering under Rule 50(b) an argument not raised in the first pre-verdict 50(a) motion, but in the second pre-verdict 50(a) motion).  Nor does the Hospital argue that it could not have waited to make its Rule 50(a) motion until after Dr. Katz had testified.  See Fed. R. Civ. P. 50(a) ("A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury." (emphasis added)).  Instead, the Hospital appears to have made a tactical decision to try to cut the trial short by arguing that there was not sufficient evidence of causation (which would have mooted the need to call any other witnesses, including Dr. Katz).

The Hospital's pre-verdict failure was not a matter of mere technical noncompliance, either.  Rather, the Hospital, pre-verdict, affirmatively said that Dr. Katz's testimony should be admitted.  Again, in the midst of trial, the district court announced that it was subjecting Dr. Katz's testimony to a Daubert-like proceeding and only conditionally admitting it.  At the conclusion of Dr. Katz's testimony, the district court asked the Hospital point-blank whether it had any objection.  And the Hospital's answer was unequivocal--no objection:

> **THE COURT:** . . . .  My questions are more basic or simple ones.  Is there any objection to -- Dr. Katz'[s] testimony to remain on the

-22-

> record and for the jury to take into account just like any other, as one more testimony in this entire trial?
>
> . . .
>
> [**The Hospital's counsel**]: No.
>
> **THE COURT**: No?
>
> [**Plaintiffs' counsel**]: No.
>
> **THE COURT**: No. Okay.
>
> [**The Hospital's counsel**]: What does no mean?
>
> **THE COURT**: No means there's no objection.
>
> [**Plaintiffs' counsel**]: There's no objection.
>
> **THE COURT**: So his testimony remains as part of the record at trial.

From there, Dr. Katz descended from the witness stand, the Hospital rested its case, and closing arguments were delivered--without the Hospital raising the admissibility of Dr. Katz's testimony again.[17] So it's not just that the Hospital failed to mention Dr. Katz's testimony in a pre-verdict Rule 50(a) motion--it affirmatively told Plaintiffs and the district court that admissibility was no longer an issue.[18]

---

[17] At oral argument, the Hospital tried to inject some ambiguity into this unequivocal statement by pointing to the Hospital's counsel's question "What does no mean?" But we see no ambiguity because, for one, there's nothing confusing about the court's question. And, importantly, the Hospital never tried to correct the record once the court clarified that it understood the Hospital had no objection.

[18] The Hospital's decision not to object to the admission of Dr. Katz's testimony at the close of trial could be viewed as another strategic decision. At closing, the Hospital used Dr. Katz's testimony to bolster its theory that G.Q.S. had only autism, not brain damage. The Hospital pointed to Dr. Katz's admissions that his review of the medical record revealed only a diagnosis of

-23-

Moreover, even setting aside the weaknesses in the Hospital's Rule 50(a) excuse, it still does not explain why the district court could grant judgment as a matter of law under Rule 50(b) where the issue also wasn't raised in the Hospital's Rule 50(b) motion. Nor does the Hospital make any attempt to shoehorn its case into any exception to Rule 50's procedural requirements, again assuming some exception--including out-of-circuit exceptions we have not yet considered and the Hospital has not cited--might apply here. See, e.g., Coons v. Indus. Knife Co., 620 F.3d 38, 41 (1st Cir. 2010) (concluding it was not error to grant judgment as a matter of law on an issue raised in a Rule 59(e) motion where the issue was sufficiently raised in a Rule 50(a) motion); see also Navigant Consulting, Inc. v. Wilkinson, 508 F.3d 277, 288 (5th Cir. 2007) (excusing failure to raise an issue in a Rule 50(b) motion as "technical noncompliance" where "the purposes of the rule are satisfied" because the 50(a) arguments and objections to jury instructions pertaining to the sufficiency of evidence made clear that the party was challenging the later-raised issue (quoting Scottish Heritable Trust, PLC v. Peat Marwick Main & Co., 81 F.3d 606, 610 (5th Cir. 1996))).

Aside from Rule 50 mechanics, the Hospital has yet another argument to try to hold on to its post-trial victory. It

autism, that the records did not show any record of brain damage, and that he did not see clinical evidence of brain damage in G.Q.S.

-24-

defends the procedure deployed below by suggesting that the evidentiary issue was "secondary" to the district court's supposedly independent ruling that there was insufficient evidence to support the jury's future-costs verdict. That is, as we can surmise from the Hospital's brief, the Hospital thinks that the district court's Rule 50(b) determination was <u>not</u> that Dr. Katz's testimony was inadmissible and, as a result, that judgment as a matter of law should enter because there was no other evidence of future costs. Rather, the Hospital says, the district court's grant of judgment as a matter of law was based on a determination that Dr. Katz's testimony--even if admissible--was insufficient to support a jury verdict of future costs.

This argument, too, doesn't hold water. Even if we indulge the Hospital's view of the sequence, the Hospital still has not shown--and we cannot find--where in its Rule 50(a) or 50(b) motions that it argued that Dr. Katz's testimony, even if admissible, was insufficient as a matter of law to support the future-costs verdict.[19] Rather, the Hospital's Rule 50(a) motion

---

[19] To be clear, we don't read the district court's stacking of the dominoes the same way as the Hospital (though we acknowledge the decision is a bit vague on this point). Rather, we see the logical flow of the district court's opinion as: (1) it took the opportunity to "reconsider[] its position" on the admissibility of Dr. Katz's testimony; (2) it concluded that his "testimony should have been disallowed" because it "suffer[ed] from the same vulnerability that prompted the exclusion of Ms. Pennachio's testimony"; and (3) it then concluded that "the jury's verdict on future expenses . . . cannot stand."

argued (as we noted earlier) that Plaintiffs did not "causally relate any of the events that happened during the birth to any damage" because there was no "evidence of brain damage," only "the diagnosis of autism, which cannot be related to the events that happened during the birth." And, poring through the nitty-gritty details of the papers, the Rule 50(b) motion argued: (1) that Plaintiffs "did not appropriately establish a causal nexus between the alleged breach and the harm, whether that be brain damage or autism"; (2) that there was no evidence that the Hospital's actions were "the direct cause of plaintiff's autism diagnosis"; and (3) that there was no "actual proof of brain damage in any part of the medical records." Thus, the Hospital argued that the entire verdict should be set aside. The Rule 50(b) motion did not argue, as the Hospital now presses on appeal, that Dr. Katz's testimony was insufficient as a matter of law to support the future-costs verdict. The Rule 50(b) motion does not allude to future costs, does not mention Dr. Katz, and does not argue that his opinion was based on the cost of caring for autism. So, even if the Hospital's understanding of the decision below is correct, that reading does not dodge the key problem here. The district court still granted post-verdict judgment as a matter of law on an issue not raised by the Hospital in either its Rule 50(a) or 50(b) motion. Which, as we have explained, is error.

In sum, we conclude that the district court erred when it jumped to an issue, which the Hospital sensibly pressed only as a ground for a new trial, to short-circuit the process and enter an amended judgment striking nearly 60% of the jury's verdict. So we will reverse, vacate its order entering an amended judgment, and remand for the district court to consider whether it should grant a new trial on the issue of future costs--which we note it was obligated to assess in its consideration of the Hospital's new-trial motion. Under Federal Rule of Civil Procedure 50(c), when a district court grants judgment as a matter of law under Rule 50, it "must also conditionally rule on any motion for a new trial by determining whether a new trial should be granted if the judgment is later vacated or reversed." But here, the district court denied the Hospital's new-trial motion on the issue of future costs because the court entered an amended judgment vacating the future-costs portion of the verdict, and no other testimony on future costs was offered aside from Dr. Katz. However, the district court also clarified that the other portions of the verdict--including the Hospital's liability for damages for physical injuries and pain and suffering--were unaffected by the amended judgment because Dr. Katz's testimony was limited to future expenses. So, we remand to the district court for its consideration and determination of only the future-costs portion of the Hospital's Rule 59 motion.

**EPILOGUE**

Before we close out, we add one additional word on the evidentiary issue. Although we don't reach the district court's admissibility determination, we note that we have some concerns with the district court's reasoning in excluding Dr. Katz. Turning to our specific concern, the district court thought that when Dr. Katz testified that his opinion was based on G.Q.S.'s needs, not a diagnosis of autism, that testimony was "a slippery slope." Yet in the examples the district court cited to emphasize the role the diagnosis played, it selectively quoted and ignored the immediate surrounding context of the statements. And the context showed that the diagnosis wasn't the whole picture. Just as one example, the court quoted Dr. Katz as saying that "he won't say the diagnosis is unimportant," but in that very sentence Dr. Katz said that the diagnosis is "not the main issue. It's the needs." And, to put a finer point on it, Dr. Katz testified at trial in response to the court's question (which he paraphrased back): "in other words, if we didn't have a label autism, would he still need these things? Yes, he would." Moreover, one thing the parties could agree on below was that Dr. Katz was not called as a causation expert. Rather, Dr. Katz was presented as a physician whose expertise is in "budget[ing] the future needs of persons who need future care." It was Dr. Crawford's role to tell the jury the link between G.Q.S.'s symptomology and the Hospital's care. And

-28-

she told the jury that G.Q.S.'s brain damage caused problems with walking, speech, behavior, intellect, impulsivity, and socialization--all needs that Dr. Katz's plan calculated the costs of caring for.  But we leave it to the parties and the district court to hash this out below.

*     *     *     *

Our review complete, we **vacate** the judgment below and remand for further proceedings consistent with this opinion.  Costs to appellants.